**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**07 CIV 5742**

---

CAPITALIA ASSET MANAGEMENT SGR,
S.p.A. and CAPITALIA INVESTMENT
MANAGEMENT S.A.

v.

VIVENDI UNIVERSAL, S.A., JEAN-MARIE
MESSIER and GUILLAUME HANNEZO

---

x
:
:
:
:
:
:
:
:
:
:
:
x

CIVIL ACTION NO.

**COMPLAINT**

**JURY TRIAL DEMANDED**



JUN 15 2007

U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

Capitalia Asset Management SGR, S.p.A. and Capitalia Investment Management S.A. (collectively "Capitalia" or "Plaintiffs"), by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation made by and through their attorneys, which investigation included, among other things, (i) review of public filings with the United States Securities and Exchange Commission ("SEC") by Defendant Vivendi Universal, S.A. ("Vivendi" or the "Company"), (ii) review of other public documents, statements, and press releases by Defendants Vivendi, Jean-Marie Messier ("Messier") and Guillaume Hannezo ("Hannezo," together with Messier, the "Individual Defendants," and collectively with Vivendi, "Defendants"), and (iii) reports by the media and securities analysts about the Company and the matters alleged herein.

## NATURE OF THE ACTION

1.    Plaintiffs bring this action in connection with their purchase and acquisition of Vivendi ordinary shares and American Depository Shares ("ADSs") in the open market between October 30, 2000 and August 14, 2002 (the "Relevant Period") and pursuant to a registration

statement and prospectus dated October 30, 2000 issued in connection with the three-way merger (the "Merger") of Vivendi, SA., The Seagram Company Limited ("Seagram") and Canal Plus, SA. ("Canal Plus") that created Vivendi Universal, S.A.  Plaintiffs seek damages pursuant to the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act'), and state common law claims for fraud and deceit and negligent misrepresentation.

2.    Vivendi started as a small French-based water utility.  Defendant Messier, however, caused Vivendi to pursue a $77 billion acquisition program that changed Vivendi into a giant global conglomerate.  Most significantly, as a result of its three-way, $46 billion Merger with Seagram (the parent of Universal Studios and Universal Music) and Canal Plus (one of Europe's largest cable TV operators) in October 2000, Vivendi immediately became one of the world's largest media and entertainment companies.  Subsequently, Vivendi's "Media and Communications" operations and its "Environmental Services" operations (which include its water utility subsidiaries) constituted the two core areas of the Company's business.

3.    In the period leading up to the October 2000 Merger and through August 14, 2002, Defendants reported strong revenue and earnings, and portrayed Vivendi as a company that was generating sufficient cash flow to satisfy its debt obligations on approximately $21 billion in debt that it had amassed in connection with financing its $77 billion acquisitions-- even though other media and communications companies in the United States and Europe were suffering through a period of retrenchment and contraction.  As a result of Defendants' repeated upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations, the price of Vivendi's ordinary shares and ADSs were artificially inflated.

4.    However, as Defendants knew but did not disclose, Vivendi's operations and financial condition were dramatically worse than what their public statements portrayed.  For example, Vivendi (using its increasingly inflated common stock as currency to finance many of its

acquisitions) bid aggressively for several large companies, with the result that Vivendi substantially overpaid for them. Moreover, subsequent events (unbeknownst to investors including Plaintiffs) confirmed that these acquired entities could not generate sufficient cash flow to justify their high acquisition cost, with the result that Vivendi's balance sheet was bloated with tens of billions of dollars of inflated "goodwill" whose value had been materially impaired and should have been written down. The failure of the Vivendi conglomerate to generate earnings in line with its publicly-touted estimates further threatened the Company's liquidity, given that the Company needed to generate massive amounts of cash flow from operations to satisfy its obligations on over $21 billion worth of debt.

5.    To conceal the deteriorating state of Vivendi's corporate conglomerate, Vivendi engaged in a variety of improper asset- and revenue-inflating practices that enabled the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS") at the end of the Company's quarterly reporting periods, rendering Vivendi's publicly filed financial statements and other communications regarding the Company's financial performance complained of herein materially false and misleading.

6.    Vivendi's improper accounting (as set forth at ¶¶ 124-193) included, *inter alia*, failing to take timely write-offs of over €29 billion in goodwill associated with Vivendi's acquisitions, including its acquisitions of U.S. Filter and Canal Plus. Defendants' failure, in violation of U.S. Generally Accepted Accounting Principles ("U.S. GAAP), to take timely write-offs of impaired goodwill caused Vivendi to improperly delay recognizing offsetting charges of over €29 billion against the Company's earnings, with the result that Vivendi's reported earnings were inflated under U.S. GAAP by tens of billions of dollars between 2000 and 2002.

7.    In addition to its failure to properly account for impaired goodwill, Vivendi also engaged in a variety of improper revenue recognition and expense deflating practices, and other

related misconduct, to inflate its reported financial performance. These practices included, *inter alia*, (a) reporting and consolidating into its own financial statements billions of dollars of revenue from entities in which Vivendi held only a minority stake and which Vivendi did not control (such as Cegetel and Maroc Telecom), in violation of U.S. GAAP (as detailed below at ¶¶ 153-173); and (b) recognizing 100% of the revenue "upfront" (*i.e.*, in contract year one) on billions of dollars of multi-year contracts in a practice known as "booking backlog," even though Vivendi had not yet performed its obligations under those multi-year contracts and U.S. GAAP required that the revenue on such contracts be recognized ratably over time as Vivendi actually performed the contracted-for services (as detailed below at ¶¶ 174-185).

8.      The foregoing improper accounting practices not only allowed Vivendi to keep its stock price artificially high, but also facilitated Defendants' fraudulent efforts to conceal the Company's burgeoning liquidity problems. For example, on December 6, 2001, defendant Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business." A week later -- after having announced that it would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc ("BSkyB") and a $1.06 billion interest in Vivendi Environnement -- Vivendi stated that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships." On December 17, 2001, Vivendi then announced that it would be acquiring USA Networks for approximately $10 billion.

9.      Unbeknownst to investors including Plaintiffs, however, Vivendi's business at that time was anything but "strong" and lacked "room for manoeuvre." To the contrary, as the *Wall Street Journal* later reported in October 2002, the Company had faced a potentially catastrophic liquidity crisis:

> On Dec. 13 last year [2001], [Defendant] Hannezo sent [Defendant]
> Messier, [Vivendi's] chairman . . . a desperate handwritten plea.

> "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief financial officer. "All I ask is that all of this not end in shame"
>
> That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo ... implored his boss and longtime friend [Defendant Messier] to take serious steps to reduce Vivendi's ballooning debt.
>
> When [Vivendi's] board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Network Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.
>
> The board endorsed the USA Networks deal.... But Vivendi was already in dire financial straits . . . . (Emphasis supplied)

"How Messier Kept Cash Crisis at Vivendi Hidden For Months; Media Giant Was At Risk Well Before Investors Knew," *The Wall Street Journal*, October 31, 2002, at A1.

10.    Without publicly disclosing the adverse material facts facing the Company -- and while affirmatively and materially misrepresenting the truth concerning the Company's actual prospects, financial performance, improper accounting practices and liquidity situation -- Defendant Messier took advantage of the market's ignorance of the truth by causing Vivendi to purchase numerous companies using artificially inflated Vivendi stock as currency. By maintaining an artificially inflated price for Vivendi's common stock, Defendants were able, in essence, to purchase tens of billions of dollars worth of Seagram's, Canal Plus and other entities' stock at a "discount," since Vivendi was paying using a currency (Vivendi's own stock) that was in reality worth only a fraction of its publicly-traded price.

11.    Defendants' motive to commit fraud and to inflate the price of Vivendi shares was further increased as a result of Defendant Messier's unilateral and secret decision to spend billions of

dollars during 2001 to buy back approximately 104 million shares of Vivendi stock (or nearly 10% of the Company's equity). Defendant Messier had Vivendi sell put options on Vivendi shares in late 2000 and 2001, making a large bet on the Company's behalf that Vivendi shares would rise. These put options obligated Vivendi to buy back tens of millions of its shares at fixed prices in the future, so that, if Vivendi's share price were to fall, the Company could lose as much as $1.4 billion. In the end, Defendant Messier's massive stock buy back scheme, though intended to help boost Vivendi's share price and thereby further facilitate still more corporate acquisitions and reduce its put option exposure, increased Vivendi's already massive debt by additional billions. As Vivendi's stock price continued to fall, causing the value of Vivendi's treasury stock and put option positions to further decline, the pressure only increased for Defendants to continue their fraud to "make up" for these further losses.

12.     Although Defendants embarked on their fraudulent scheme to conceal the Company's financial problems no later than October 30, 2000, the market – and Plaintiffs – did not begin to learn of the extent of Vivendi's severely weakened financial condition and deteriorated value until July 2, 2002. On that date, a credit rating agency downgrade of Vivendi's debt, according to one published report, "sparked near-panic selling in Paris that caused Vivendi shares to plunge 25% for the day, to a new IS-year trading low of €17.8." The same credit agency report also disclosed that Vivendi's financial obligations in 2002 could be as much as $3 billion more than -- or approximately *twice* as large as -- what most analysts had expected. The situation was so dire that, although unbeknownst to the public at the time, Goldman Sachs had privately presented several scenarios for Vivendi's future to a group of Vivendi board members on June 24, 2002 -- and one of those scenarios showed Vivendi going bankrupt in as little as just three or four months (*i.e.*, in September or October of 2002).

13.    On July 3, 2002, the board forced Defendant Messier to resign.  The board obtained defendant Hannezo's resignation a few days later.  Messier, however, stubbornly refused to admit any wrongdoing, stating on the day he was forced out that there were "no underestimated liabilities" and "no overvalued assets" on Vivendi's financial statements, and that the Company's previously reported financial results were all "true, genuine and complete."  However, the complete story had yet to be told.

14.    On August 14, 2002, Vivendi reported that it had suffered a huge loss of approximately $12 billion for the first half of 2002, and that it would have to sell approximately $10 billion in assets in an effort to reduce its debt.  Vivendi's new chairman, Mr. Jean-Rene Fourtou, also admitted that "[w]e are facing a liquidity problem."  That same day, Standard & Poor's further cut its ratings on Vivendi's long-term corporate debt to junk status.  In response, the price of Vivendi's ordinary shares plunged nearly another 25% on August 14, to as low as €11.89.

15.    In the wake of these disclosures, formal investigations into Vivendi's accounting practices and disclosures to the market were commenced in both the U.S. and France, including: (a) a criminal investigation by French prosecutors; (b) a criminal investigation by the U.S. Department of Justice; (c) an investigation by the Commission des Operations de Bourse ("COB"), now the AMF; and (d) a formal civil investigation by the SEC.

**JURISDICTION AND VENUE**

16.    The claims asserted herein arise under and pursuant to (i) Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. § 77k, 77l(a)(2), and 77o; (ii) Sections 10(b), 18 and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78r, and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.l0b-5; and (iii) state common law.

17.    This Court has jurisdiction over the subject matter of this action pursuant to (i) 28 U.S.C. §§ 1331, 1332 and 1367; (ii) Section 22 of the Securities Act, 15 U.S.C. § 17v; and (iii) Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.    This court may properly exercise subject matter jurisdiction over the claims of foreign purchasers of Vivendi ordinary shares traded on foreign markets under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses.

19.    In a decision by Judge Baer in a class action filed against Vivendi on claims and facts virtually identical to the case at bar (*In re Vivendi Universal, S.A. Securities Litigation*, 381 F. Supp. 2d 158 (S.D.N.Y. November 3, 2003) (Civil Action No. 02-Civ 5571(RJH)) the Court denied the Defendants' motion to dismiss in that case pursuant to Rule 12(b)(1), finding that the Court possessed subject matter jurisdiction over claims brought by foreign class members who acquired Vivendi ordinary shares traded on foreign markets.  (*Id.* at 169).

20.    In doing so, the Court applied the "conduct" test set forth by the Second Circuit in order to determine extraterritorial application of the federal securities laws. Judge Baer found that the Defendants' conduct within the United States was not merely preparatory but "was a substantial or significant contributing cause of foreign investors' decisions to purchase Vivendi's stock." *Id.*  at 170 (internal quotations omitted)

21.    Such conduct within the United States included Vivendi acquiring well-known U.S. entertainment and publishing companies (Universal Studios, Houghton Mifflin, USA Networks), and taking on a $21 billion debt while assuring investors "through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debts." *Id.* at 169.

22.    In addition to the U.S. acquisitions, and significant to the Court, was the fact that two of Vivendi's senior officers (and alleged principal actors of the fraudulent scheme) Messier (former CEO) and Hannezo (former CFO), from September 2001 through the end of the relevant class period of August 31, 2002, spent half of their time in the United States specifically to increase investments by United States investors in Vivendi and to allegedly "better direct corporate operations and more effectively promote misleading perceptions on Wall Street." *Id.* at 169-170.

23.    Upon Defendants' motion for reconsideration, Judge Holwell revisited Judge Baer's decision finding subject matter jurisdiction and concurred with Judge Baer's opinion finding jurisdiction pursuant to the conduct test. (*See In re Vivendi Universal, S.A. Securities Litigation*, 2004 WL 2375830 (S.D.N.Y.  October 22, 2004)).

24.    The Court went further to formally concur with Judge Baer's opinion, stating; "this Court concurs with Judge Baer's opinion finding jurisdiction over this dispute pursuant to the conduct test ...."

25.    Moreover, the Court found that in addition to the allegedly false statements made to Wall Street analysts, on which Judge Baer based his opinion, Judge Holwell found of "crucial importance" to jurisdiction the presence and conduct of Messier and Hannezo in the United States. *Id.* a*7.

26.    Defendants engaged in extensive fraud-related conduct in the U.S., which was part of a single fraudulent scheme spanning the U.S. and other countries.  The domestic conduct was not merely "preparatory," but led directly to losses by both foreign and domestic investors.  In addition to the substantial U.S. conduct in furtherance of the fraud, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over Plaintiffs' claims who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi ordinary shares traded on foreign and U.S. markets, and were defrauded by Defendants' misrepresentations.

27.    The fraud perpetrated on the worldwide market by Vivendi came directly from the Company's $77 billion acquisition spree, during which Vivendi acquired several high profile U.S. companies, spending in excess of $54 billion for its U.S. interests.  For example, the following U.S. companies, among others, were acquired in whole or in part by Vivendi:

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
|---|---|---|
| Waste Management Inc. | Houston, TX | € 103.5 million |
| US Filter Corp. | Palm Desert, CA | $ 6.2 billion |
| Seagram Company Ltd. | Universal City, CA | $ 34 billion |
| Uproar.com | New York, NY | $ 128 million |
| MP3.com, Inc. | San Diego, CA | $ 400 million |
| Emusic.com | San Diego, CA | $ 24 million |
| Houghton Mifflin Co. | Boston, MA | $ 2.2 billion |
| EchoStar Communications Corp. | Littleton, CO | $ 1.5 billion |
| USA Networks | New York, NY | $ 10.3 billion |

28.    In addition to Vivendi's U.S. acquisitions, a large number of Defendants' false and misleading statements were initially made in the U.S. and all were disseminated within the U.S.. Vivendi also regularly filed false and misleading reports with the SEC in the U.S., including Form 20-F Annual Reports and numerous Form 6-Ks as alleged herein.

29.    In addition, Defendants' false and misleading statements not made in the U.S. were disseminated into the U.S. and internationally through the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

30.    According to the Company's Form 20-F for the fiscal year ended December 31, 2001, signed and filed with the SEC on May 28, 2002 (the "2001 20-F"), over 54% of Vivendi's long lived assets, valued at €53.522 billion, were located in the U.S.  The 2001 20-F also states that Vivendi's 2001 U.S. revenue was purportedly over €7 billion.  At a luncheon in Los Angeles on

January 19, 2002, Defendant Messier stated that Vivendi was "[f]orty percent within the United

States, sixty percent out of the states," and in a February 17, 2002 interview on CNN, Defendant

Messier stated that the Company "has 50,000 U.S. employees."

      31.    Venue is proper in this District pursuant to (i) Section 22 of the Securities Act, 15

U.S.C. § 77v; (ii) Section 27 of the Exchange Act, 15 U.S.C. § 18aa; and (iii) 28 U.S.C. § 1391(b).

Vivendi conducts business and maintains the Company's U.S. headquarters in this District.  In

addition, back in 2001 through 2002 Defendant Messier resided in this District when he moved

himself and his family into a $17 million penthouse apartment in Manhattan.  Defendant Messier

currently resides in this District on the Upper East Side. During his February 17, 2002 CNN

interview, Defendant Messier explained why he moved to New York:

> Moving to New York, yes there [were] very simple reasons.  The first
> one Vivendi Universal has 50,000 U.S. employees.  They have a boss.
> Where is the boss?  The boss is in the U.S.  He's working there.  I
> can meet with them.  I can spend time with them.  He is really the
> boss.
>
> The second goal was Vivendi International is a new group for many
> U.S. investors in the media field.  We need and I needed to spend
> more time with the U.S. Universal community to explain the Vivendi
> Universal story, to go through all reasons of performances of
> prospects, and I think that it's just better to do it being an American,
> than being outside.

Similarly, in an interview on "Market Call" from New York on February 27, 2001, Defendant

Messier reiterated that one of the primary reasons for moving to New York was to promote Vivendi

to U.S. investors and Wall Street:

> I'm not frustrated.  I'm enthusiastic about doing and continuing and
> persuading this education job [for American investors and Wall Street
> analysts].  Since the merger, the level of U.S. investors in all capital
> has jumped from less than 10 percent to more than 25 percent.  I
> have a very simple goal in mind.  I want the level of U.S. investors,
> within Vivendi Universal, to reach as quickly as possible 50 percent
> of all capital…I will take any necessary step to convince and educate
> Wall Street and U.S. investors.

In addition, many of the acts and practices complained of herein, including the dissemination of materially false and misleading statements, occurred in this District.

32.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

33.     Capitalia Asset Management SGR, S.p.A. is an asset management company that manages mutual funds. Capitalia Asset Management SGR, S.p.A. belongs to the Capitalia Group, which ranks fourth in the Italian mutual fund market.

34.     Capitalia Investment Management S.A. is a Luxembourg asset management company that manages mutual funds. Capitalia Investment Management S.A. belongs to the Capitalia Group.

35.     Defendant Vivendi describes itself as a global conglomerate engaged in business focused primarily on two core areas: "Media and Communications" and "Environmental Services." Vivendi's Media and Communications business is divided into five segments: (a) Music (conducted through Universal Music Group, which produces, markets, and distributes recorded music throughout the world in all major genres); (b) Publishing (purportedly Europe's premier publisher of information, which provides content across multiple platforms, including print, multimedia, on the wired Internet and to PDAs (Personal Digital Assistants) via WAP (Wireless Application Protocol) technology); (c) TV and Film (which produces, distributes and licenses motion picture, television and home video/DVD products worldwide, owns and operates a number of cable and pay TV channels, and operates theme parks and retail stores around the world); (d) Telecoms (which provides a range of telecommunications services, including mobile and fixed telephony, Internet access, and data services and transmission, principally in Europe); and (e) Internet (which manages strategic Internet initiatives and new online ventures). Defendant Vivendi Universal, S.A. is the

entity created by the Merger, and is named as a Defendant herein in its own right and as the successor entity and successor-in-interest to Vivendi, SA., Seagram and Canal Plus.

36.    Vivendi Environnement, a subsidiary of Vivendi, operates the Company's worldwide environmental services business, including its water utility operations.

37.    Defendant Messier was Vivendi's Chief Executive Officer and Chairman of the Company's Board throughout the Relevant Period until he was forced to resign on July 3, 2002. Messier received compensation of $4.8 million in 2001 despite the Company's record loss, as well as various other perquisites, including use of a $17 million apartment the Company acquired for him in New York.

38.    Defendant Hannezo was Chief Financial Officer of Vivendi throughout the Relevant Period until his resignation on July 9, 2002.  Hannezo was, according to the *Associated Press*, a "close collaborator" of Messier.

39.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein, were aware of, or recklessly disregarded, that materially false and misleading

statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

40.    Because of their Board memberships and/or executive and managerial positions with Vivendi, each of the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

41.    The statements made by the Individual Defendants, as particularized below, were materially false and misleading when made.  The true financial and operating condition of the Company, which was known or recklessly disregarded by the Individual Defendants, remained concealed from the investing public.  The Individual Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them.  As officers and directors, and controlling persons, of a publicly held company governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Vivendi's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

42.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases and other public statements pertaining to the Company. Each Individual Defendant was provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not the public, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations concerning the Company complained of herein were then materially false and misleading. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

43.    Each of the Individual Defendants is liable as a direct participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Plaintiffs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Vivendi's business, operations, management and the intrinsic value of Vivendi ordinary shares and ADSs; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain credit ratings so that Vivendi could accumulate more and more debt to make acquisitions on terms favorable to Vivendi; and (iv) caused Plaintiffs to purchase and acquire Vivendi ordinary shares and ADSs at artificially inflated prices.

## **FACTUAL BACKGROUND**

44.    In June 1996, Messier became chairman of Generale des Eaux, Vivendi's predecessor. At that time, Generale des Eaux was -- as it had been since it was founded in the 19th century -- primarily a water utility company. When Messier became CEO in 1996, Vivendi's stock

was trading in the €27 to €29 range.  Messier changed the name of Generate des Eaux to "Vivendi"

in April 1999.

45.    After becoming CEO, Messier embarked on an ambitious plan to turn the Company

into one of the world's largest media companies.  Beginning in 1998, Vivendi acquired the following

companies:[1]

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED |
|---|---|---|
| Quotidien Sante | 4/9/98 | 100% |
| Linjebuss AB | 4/15/98 | 66.7% (33% owned) |
| Havas SA/Old | 6/2/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| l'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 43.17% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINAGmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6% (5% owned) |
| FCC | 3/5/99 | 28% |
| Aique | 4/20/99 | 100% |
| US Filter Corp. | 4/30/99 | 100% |
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |
| Canal Plus | 7/22/99 | 15% (34% owned) |
| British Sky Broadcasting PIc | 7/22/99 | 4% (20.5% owned) |
| Aqua Alliance Inc | 8/24/99 | 17% (83% owned) |

---

[1] Pre-existing ownership interest, if any, shown in parenthesis.

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED |
|---|---|---|
| Pathe | 9/30/99 | 80.2% (19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/9/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |
| Three V Health Inc. | 2/29/00 | 100% |
| Haniel Rohr; Kanal Service & Haneil Industrie Reinigung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| KD Offshore | 5/30/00 | 100% |
| Quod Bonum BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland.ComSA | 9/21/00 | 55.01% |

46.     Messier's early growth strategy required the Company to finance its acquisitions, which caused the Company to accumulate large amounts of debt.  For example, in March 1999, Vivendi had to finance its $6.2 billion acquisition of U.S. Filter Corp. ("U.S. Filter") by raising approximately €5.7 billion through a convertible bond offering.  Similarly, in December of 1999, Vivendi increased its equity investment in Elektrim Telekomunikacja ("ET"), a Polish conglomerate, to $1.2 billion (or 49% of ET's equity), by investing an additional $250 million in cash and converting an earlier $615 million loan into ET shares.

47.     In June 2000, Vivendi announced the acquisition of Seagram (which owned Universal Studios and Polygram Records) for $36 billion and Canal Plus for $12 billion, both in Vivendi common stock.

## VIVENDI CONTINUES TO ACQUIRE COMPANIES

48.     Following the Merger on December 8, 2000, many analysts expected Vivendi to make sure that its newly merged and recently acquired businesses were achieving desired synergies

before consummating new deals.  Defendants, however, did not do so.  Within just sixteen months

following the large three-way merger with Seagram and Canal Plus, Vivendi acquired significant

equity positions (or added to its existing equity positions) in the following companies, several of

which Vivendi acquired outright:

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---|---|---|---|
| Maroc Telecom | 12/21/00 | TelecomServices | 35% |
| MUSIDISC | 1/31/01 | Multimedia | 0.98%  (99.02% owned) |
| Medicine Publishing | 2/1/01 | Publishing | 100% |
| HCCOM | 2/19/01 | Publishing | 100% |
| Uproar Inc. | 3/23/01 | Internet Connectivity | 100% |
| GetMusic LLC | 4/25/01 | Internet Content | 50%  (50% owned) |
| Editions Juris Service | 4/25/01 | Multimedia | 100% |
| Emusic.Com Inc | 6/14/01 | E-Commerce | 100% |
| RMM Records & Video | 6/25/01 | Music | 100% |
| Scoot EuropeNV | 7/27/01 | Broadcast Server | 50% (50% owned) |
| HoughtonMifflinCo. | 8/3/01 | Publishing | 100% |
| MP3.com | 8/28/01 | Internet Content | 100% |
| ElektrimTelekomunikacja | 9/4/01 | Telecom Services | 2% (49% owned) |
| Mediabright | 9/12/01 | Applications Software | 100% |
| Studio Canal | 10/12/01 | Motion Pictures Services | 14.8% (85.20% owned) |
| Multithernatiques | 12/17/01 | CableTV | 27% |
| EchoStarCommunications | 1/22/02 | Satellite Telecom | 10% |
| KochGroupRecorded Music | 2/15/02 | Music | 100% |
| USA Network Entertainment | 5/7/02 | Cable TV | 93% |

49.    The vast majority of these post-Vivendi/Seagram/Canal Plus merger acquisitions

were paid for either using Vivendi stock as currency, or by borrowing against future earnings.  Thus,

in order to sustain its growth by acquisition strategy, it was crucial for Defendants to continue to

report favorable financial results in order to keep Vivendi's stock price high and to maintain its

favorable credit ratings and access to additional debt financing.

## FALSE AND MISLEADING STATEMENTS

50.     On October 30, 2000, Vivendi issued a Registration Statement filed on Form F-4 with the SEC and signed by defendants Messier and Hannezo in connection with the Merger of Vivendi, Seagram, and Canal Plus.  The Form F- 4 presented historical financial statements for FY 1999 and the first half of FY 2000.  Vivendi reported revenue of $16.427 billion and net income of $509 million for the first half of FY 2000; and revenue of $17.487 billion and net income of $254.6 million for the comparable period in 1999.  Vivendi also reported shareholders' equity of $11.957 billion and total assets of $73.611 billion as of June 30, 2000.

51.     However, for the reasons set forth in greater detail below at ¶¶ 124-193, Vivendi's historical financial statements and balance sheets contained in Vivendi's October 30, 2000 Form F-4 were materially false and misleading because, *inter alia*, the Company improperly consolidated into its financials revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership), failed to timely write-down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter, and overstated the Company's revenue from its environmental division on certain multi-year contracts in violation of GAAP.

52.     On December 22, 2000, Vivendi issued a press release announcing that it had purchased a 35% stake in Maroc Telecom S.A. ("Maroc Telecom"), Morocco's telephone monopoly for approximately €2.3 billion.

53.     On February 14, 2001, Vivendi issued a press release in Paris and New York announcing preliminary results for FY 2000:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7 billion euros, with media and communications and environmental services accounting for 40.0 billion euros, a global 36.5% increase over 1999.  Jean-Marie Messier, Chairman and CEO of Vivendi Universal, said, "Vivendi Universal was created on December 8, 2000.  The 2000 Vivendi Universal figures are showing the considerable burst of growth of our communications activities in 2000 both in global growth and even more important with a near

20% internal growth. <u>Vivendi Universal enters its first full year of operations with strong growth prospects and a very strong balance sheet. This new company is off to a fast start and we are very confident that we will meet the very aggressive growth targets we have set for ourselves both at the revenues and EBITDA levels.</u>"
[Emphasis added.]

54.    On March 9, 2001, Vivendi issued a press release reporting "better than expected" fourth quarter and FY 2000 results. Vivendi announced actual revenues of €41.8 billion for FY 2000 including Media and Communications revenues of €13.6 billion and Environmental Services revenues of €26.5 billion. The press release further stated:

> Vivendi Universal announced today that on a pro forma basis for calendar 2000, the Company reported 7.2 billion euros in EBITDA (earnings before interest, taxes, depreciation and amortization) for the period ending December 31, 2000, up 48 percent from 1999. Results reflect strong performance across the Company's business units -- Media and Communication and Environmental Services. Actual EBITDA for the 12 months ended December 31, 2000, was 6 billion euros versus 4.3 billion euros in 1999.

> The pro forma results were driven by growth in all business segments with the exception of Internet, in which development costs related to business expansion continued to have a negative impact on earnings . . . .

> Net income climbed 44 percent, before goodwill, to 2.8 billion euros or 4.4 percent basic shares up 19% and 60 percent, after goodwill, to 2.3 billion euros, from 1.4 billion euros. The Board of Directors of Vivendi Universal has recommended to the shareholders to approve an annual dividend of one euro per-share, which will represent a high 47 percent pay-out ratio . . . .

> Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal, stated: "The strong results that Vivendi Universal has generated for calendar 2000 provide a very solid foundation for the Company's growth prospects in 2001. <u>The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001.</u> The Company's unique combination of content and distribution assets paves the way for enormous growth opportunities. We have our management teams and plans in place as we moves [sic] to execute the growth strategies. The management team, in particular, has been focused on the day-to-day operational performance and increased productivity of each of the Company's

business units.  I am very confident that, for Media and Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the period 2000-2002 and achieve superior returns for Vivendi Universal shareholders . . . .  <u>Our businesses are strong, our management is focused and growth prospects are real and immediate.</u>"  [Emphasis added.]

55.     On March 12, 2001, as reported in *La Tribune*, defendant Messier stated the

Company had exceeded expectations:

Franco-Canadian media and communications group Vivendi Universal SA (VU) has announced its results for 2000, which were in line with forecasts, and has confirmed its objectives for 2001. Presenting his group's results for the year, VU chairman Jean-Marie Messier commented:  "<u>When we merged, it was said that our aims were too ambitious.  Well, we have exceeded them!</u>"  [Emphasis added.]

56.     The statements made by Defendants referenced in ¶¶50-55 above, were each

materially false and misleading because, *inter alia*, the Company was engaged in improper accounting

practices which had the effect of materially overstating Vivendi's reported earnings (as particularized

below at ¶¶ 124-193), including: (a) failing to timely write-down certain overvalued assets from

previous corporate investments and acquisitions; (b) improperly consolidating into its financials

revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c)

overstating the Company's revenue from certain multi-year contracts.  In addition, the Company

failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶

186-193) and that Vivendi would necessarily heed to restructure its debt obligations in order to

remain solvent and avoid bankruptcy.

57.     On April 23, 2001, Vivendi issued a press release announcing "very strong" first

quarter 2001 results.  The press release announced that Media and Communications revenues were

up 10% to €5.9 billion, and Telecoms revenues were up 30% to €1.5 billion.  The press release

further reported that Media and Communications EBITDA increased 112% to €900 million and

that Telecoms EBITDA more than tripled to €433 million.  The press release quoted Defendant

Messier as follows:

> "I am very pleased with Vivendi Universal's outstanding performance
> in our first quarter as a new company.  All our results meet or exceed
> our key operating targets.  We created significant momentum by
> delivering solid first quarter 2001 results in EBITDA, which more
> than doubled, and by **generating double digit revenue growth…**
>
> These results show the focus and dedication of all our management
> teams, in executing the unique promise of Vivendi Universal around
> its global strategy.  This is a great beginning.  With our momentum,
> our targets and the drive of our executive team, I am extremely
> confident that for Media and Communications, we will reach our
> annual EBITDA and revenue growth targets of 35% and 10%,
> respectively in 2001 and 2002 and achieve superior returns for
> Vivendi Universal shareholders . . . .
>
> We are also ahead of targets for the synergies which indicate that the
> path of integration between our teams is great.  My only focus is and
> remains execution of this compelling media merger."  (Emphasis
> added)

58.    On April 24, 2001, Defendant Messier addressed Vivendi's shareholders at the

Company's shareholders' meeting:

> The foundations of our communications-related businesses are
> particularly healthy and strong.  Guillaume Hannezo has just detailed
> our performance for you.  I would just like to emphasize a few
> points:
>
> -    a healthy balance sheet with total equity reaching 66 billion
>      Euro;
> -    a pro forma net debt that is practically non-existent - around
>      three billion Euro;
> -    Vivendi Universal posted record-high net income, and has
>      cash available for investing (participation in BskyB, etc.);
> -    Vivendi has rapidly growing revenue, which reach the double
>      digits annually, spread out through all the European and
>      American markets (60% and 40%); extraordinarily large
>      customer bases; several dozen million subscribers; business
>      models often based on subscription - meaning loyalty,
>      recurrence, predictable revenues, and very  little dependence
>      on the advertising market.

Financially, Vivendi Universal, concerning the communications
sectors, is rock solid - very stable with high growth…

In my role as the president and as an employee of the company, I
owe you the company's results. Here they are. They are good . . . .
Vivendi Universal, our company, your company, is solid. Today, we
are a leader, strong, dynamic, and profitable. [Emphasis added.]

59.     On May 18, 2001, Vivendi filed a Form 6-K with the SEC providing total revenue

information for first quarter 2001. This Form 6-K stated in part:

Vivendi Universal revenue for first quarter of 2001 totaled 12.6
billion euros, a global 34.5% increase over the first quarter of the
prior year. Vivendi Universal's media and communications
businesses accounted for 5.9 billion euros and environmental services
businesses accounted for 6.7 billion euros. [Emphasis added.]

60.     The statements made by Defendants referenced in ¶¶ 57-59 above, were each

materially false and misleading because, *inter alia*, the Company was engaged in improper accounting

practices which had the effect of materially overstating Vivendi's reported earnings (as particularized

below at ¶¶ 124-193), including: (a) failing to timely write-down overvalued assets from previous

corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from

its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the

Company's revenue from certain multi-year contracts. In addition, the Company failed to disclose

that it was suffering from a growing liquidity crisis (as particularized below at ¶¶186-193) and that

Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and

avoid bankruptcy.

61.     On June 1, 2001, Vivendi issued a press release announcing the acquisition of

Boston-based Houghton Mifflin Company. The release, issued in Paris and Boston, stated in part:

Based on a total consideration of approximately $2.2 billion, which
includes the assumption of Houghton Mifflin's average net debt of
$500 million, the offer price represents 1.9 times 2001 estimated
revenues of Houghton Mifflin, 7.7 times 2001 estimated EBITDA
(earnings before interest, taxes, depreciation and amortization) and
10.7 times estimated EBITDA after book plate amortization.

62.     On July 2, 2001 Vivendi filed its Form 20-F for the fiscal year ended December 31,

2000 with the SEC, which was signed by defendant Hannezo.  The 20-F contained Vivendi's

"consolidated financial statements for the years ended December 31, 2000, 1999 and 1998 and as at

December 31, 2000 and 1999."

63.     On July 23, 2001, Vivendi issued a press release announcing its "very strong" second

quarter and first half 2001 Media and Communications results.  Vivendi reported Media and

Communications revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and

EBITDA grew 57% to €1.3 billion.  Concerning Vivendi's first half 2001 results for Media and

Communications businesses, the press release stated in part:

-       In the course of the first half of 2001, Vivendi Universal
        achieved three quarters of its full-year target of incremental
        EBITDA (nearly 800 million euros excluding Maroc
        Telecom, relative to the company's target of slightly more
        than 1 billion euros).

-       In the first half of 2001, revenues increased to 12.4 billion
        euros (up-15% [excluding USGD], and EBITDA grew to 2.2
        billion euros (up 77% over 2000 comparable period).

64.     Defendant Messier commented on the results, stating in part as follows:

The results produced by Vivendi Universal in the second quarter are
well ahead of market consensus . . . .  They confirm the robustness of
our businesses, with limited exposure to advertising; the benefits of a
truly global position; and the fast progress of the reorganization and
implementation of our recent merger.

With three quarters of the 'aggressive' incremental EBITDA target
for the full year 2001 [1.12 billion euros of incremental EBITDA, or
35%, over the pro forma 2000 guidance provided last October and
slightly above 1 billion euros of incremental EBITDA over the final
2000 results] already achieved in the first half of the year, I can only
re-emphasize our confidence.  We will at least meet our stated targets.

Obviously, our current stock price does not fully reflect this situation
in terms of EBITDA multiples or Enterprise Value to EBITDA to
growth.  With the highest growth rates of the industry and the lowest
multiples, our stock is definitely an attractive investment today.

> The first half has been a period of total operational focus in each of
> our businesses, while completing significant achievements in the
> implementation of the merger, reorganization and execution of our
> strategy.  [Emphasis added.]

65.    Following the July 23, 2001 press release, Vivendi hosted a conference call to discuss

the second quarter 2001 results and the Company's business and prospects.  During the call,

Defendant Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down
  market and was in fact gaining market share.

- The Company was still on track to achieve strong growth in
  revenues and earnings in 2001, including EBITDA growth of
  35%.

66.    As a result of the press release and the false and misleading statements therein, on

July 23, 2001, Vivendi common stock increased 5% to €63.1.

67.    Securities analysts that followed Vivendi reacted positively to the Company's

announcement of second quarter 2001 results.  For example, in a report dated July 23, 2001,

Robertson Stephens, Inc. ("Robertson Stephens") issued a "Buy" rating stating:  "We expect the

company to perform well through a sluggish economy and to emerge strategically well-positioned."

Similarly, Merrill Lynch Capital Markets ("Merrill Lynch") issued a "Buy" rating in an analyst report

dated July 26, 2001, stating in pertinent part as follows:

- Outperformance was across virtually all divisions particularly
  Film, Telecoms and Music.

- As a result, we are upgrading our 2001 OCF a second time by
  2% . . . .

- Company re-confirmed its targets for 2001.  In a down music
  market, Universal is gaining share and is confident of double
  digit EBITDA growth.

68.    The statements made by Defendants referenced in ¶¶ 61-67 above, were each

materially false and misleading because, *inter alia*, the Company was engaged in improper accounting

practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶124-193), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts.  In addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶ 186-193) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

69.    In early September 2001, as rumors circulated that Vivendi's earnings would be disappointing, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its ordinary shares declined from the mid-€5.0s to the mid-€40s.  In response, Defendants categorically denied any problems and, after the market closed on September 5, 2001, reiterated its targets for 2001 and 2002.  Defendant Messier stated in an interview with Reuters that evening, that "no profit warning of any kind needs to be feared coming from Vivendi Universal."

70.    On September 25, 2001, Vivendi issued a press release announcing "Strong First Half 2001" results and a "Solid Outlook for 2002."  The press release reported that revenues increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached €1.1 billion or €0.97 per share.  With respect to Media and Communication, the release reported that first half 2001 revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion, up 77%, and that operating income nearly tripled to €946 million, up 184%.  Concerning Vivendi's environment business, the release reported that revenues were up 11% to €13.9 billion, that EBITDA was up 12% to 1.76 billion euros, and that operating income was up 13% to 0.9 billion euros.  Commenting on these results, the press release further quoted Defendant Messier as follows:

Despite the current environment, we will reach all our previously stated revenue/EBITDA objectives for the 2001 year.  I continue to express my confidence in achieving our more than 10% revenue growth targets for 2001 and our more than 35% EBITDA growth (versus the company's October 2000 guidance) at a constant-asset base.  This, combined with some extensions in the company's asset base (*i.e.*, MarocTelecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly north of 5 billion euros.  In the current environment, giving a 2002 target would not be meaningful, and we have yet to complete our 2001 budget and plan process.  Before the recent tragedy [of September 11], market consensus for 2002 EBITDA was not far from 6 billion euros.  Despite the events, looking at the trends of our businesses and our defensive qualities, we are currently very confortable [sic] with this expectation.  (footnote omitted)

71.    On October 30, 2001, Vivendi issued a press release announcing its third quarter 2001 Media and Communications results.  The release announced that Media and Communications revenues were up 2.4 % to €7.3 billion, and that EBITDA was up 90% to €1.5 billion.  The release further reported that Telecoms revenues increased by 17% to €2.1 billion, and EBITDA growing by 31% versus *pro forma* results for the third quarter of 2000.  The release also stated in pertinent part:

-      On a pro forma basis, third quarter revenue growth was 8% and EBITDA growth was 30%.  Year-to-date revenues increased 9%, and EBITDA increased 46%.

-      Company reaffirms confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001.

"Our third quarter results/or the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment," said Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal.  "They reflect both our higher potential/or growth and greater resiliency to recessionary environments compared to many of our peers . . . .

"Additionally, Vivendi Universal's media and communications businesses are presently less vulnerable to recessionary environments than many of our peers because of our strong defensive qualities . . …
Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers.

"An early look at the fourth quarter indicates that we are on track to meet our targets. <u>I continue to express my confidence in achieving 10% revenue growth and 35% EBITDA growth in 2001 at a constant asset base.</u> This, combined with some expansions in the company's asset base (*i.e.*, MarocTelecom and Houghton. Mifflin), should result in full-year Media and Communications EBITDA slightly above 5 billion euros. (emphasis added; footnotes omitted)

72.    Following the October 30, 2001 Press Release, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects. During the call, Defendants Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down market and was in fact gaining marketshare.

- The Company was still on track to achieve strong growth in revenues and earnings in 2001.

73.    Based on Defendants' statements, including those made during the conference call, securities analysts reacted positively to the Company's reported financial results. For example, on October 31, 2001, Morgan Stanley Dean Witter ("Morgan Stanley") issued an "Outperform" rating, stating:

We continue to accord Vivendi Universal on OutPerform-V rating with a Euro62 twelve-month price target. Our investment thesis is based on VU's valuation, lack of sensitivity to economic recession, and diversity of revenue sources. In a quarter in which all its peers were forced to revise their 2001 and 2002 outlooks downward to reflect continued US economic weakness exacerbated by the events of Sept. 11, Vivendi Universal outperformed expectations and reiterated its full year guidance. The divergence between VU and its peers reflects the company's high level of financial predictability, a direct function of owning a number of internationally diversified, market share-leading businesses that have a low dependence on advertising.

74.    The statements made by Defendants referenced in ¶¶ 69-73 above, were each materially false and misleading because, *inter alia* the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 124-193), including: (a) failing to timely write-down overvalued assets from previous

corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 186-193) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

75.    On December 6, 2001, Vivendi issued a press release in which defendant Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business." One week later -- after announcing that it would raise $2.5 billion by selling a $1.5 billion interest in BskyB and a $1.06 billion interest in Vivendi Environnement -- Vivendi stated, as reported by the *Financial Times (London)* on December 14, 2001, that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships."

76.    On December 17, 2001, Vivendi issued a press release announcing the acquisition of USA Networks for $10.3 billion. Commenting on the acquisition defendant Messier stated in pertinent part as follows:

> Our strategy is clearly coming together. Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.
>
> * * *
>
> In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level EBITDA, net income and free cash flow. By using mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.
>
> * * *

> At the end of just one year following our merger with Seagram and
> Canal+, we have put the pieces together in fulfilling our strategy.  In
> one short year, we have focused on integration and addressing our
> relative distribution weakness in the U.S. - and here we are today.
> We expect that 2002 will be a year of growth, without further change
> in perimeter.

77.    On December 17, 2001, Defendant Messier held a press conference with Barry

Diller, Chairman and CEO of USA Networks, from the St. Regis Hotel in New York City to discuss

the acquisition of USA Networks, creation of Vivendi Universal Entertainment ("VUE"), and

Vivendi's prospects for 2002:

> At the end of the day, this transaction is not putting pressure on
> Vivendi Universal.  On the reverse, what it allows us to do is to
> increase our [EBITDA] target for 2002 by more than ten percent.
> It's to increase our net income in 2002 by roughly 200 million dollars.
> It's to increase the net free cash flow of the group in 2002 by, let's
> say, three hundred and fifty million dollars.  At every level of the
> [P&L] and of the cash flow that you may look at, this transaction is
> very positive to VUE shareholders year one.
>
> * * *
>
> As far as the global [debt] ratio of the group is concerned, our target
> is to have in '02 a [debt] to [EBITDA] ratio well below three times
> and especially we are focusing to reach that target ahead of the end of
> the first half of 2002, which means that Vivendi Universal will end up
> its program of selling its non core asset in the first half of '02; it will
> give us very comfortable triple B credit rating targets that we are very
> comfortable with....  So, no cleaning of balance sheet because the
> balance sheet is clean. . . , [W]e are committed to issue full US
> [GAAP] earnings starting Ql of '02.  We already, in fact, worked on
> the basis of US [GAAP] accounting methods in '01 in order to build
> our track record at the time of this year, at the time of the release of
> our first full quarterly U.S. [GAAP] in '02.  So we are already applying
> all US [GAAP] methodologies, including those relating to
> amortization.  [Emphasis added.]

78.    The statements made by Defendants referenced in ¶¶ 75-77 above, were each

materially false and misleading because, *inter alia*, the Company was engaged in improper accounting

practices which had the effect of materially overstating Vivendi's reported earnings (as particularized

below at ¶¶ 124-193), including: (a) failing to timely write-down overvalued assets from previous

corporate investments and acquisitions; (b) improperly consolidating into its ·financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts.  In addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶ 186-193) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

79.    On February 6, 2002, *AFX News Limited* reported that in an attempt to dispel concern about the Company's debt levels and accounting practices, a letter was distributed to the Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media company will not make any change in its guidance for 2001 earnings due for release on March 5, although the fourth quarter was a difficult period.
>
> Messier made the comment in a letter to Vivendi's staff, addressing the recent volatility and losses in the company's share price . . . .
>
> "Some global markets, including the music market, declined during this period.  But despite the difficulties, <u>we are the only media company not to have issued a profit warning on its operating results and there's no change to that situation</u>," said Messier.
>
>                 * * *
>
> <u>"There are no hidden risks and no speculative instruments,"</u> he said. [Emphasis added.]

80.    On February 11, 2002, Vivendi issued a press release announcing its year-end 2001 Media and Communications results.  Vivendi announced Media and Communications "pro forma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros."  The release further reported that Vivendi's Telecoms segment achieved 24% revenue growth in 2001, and that "[r]evenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago."

81.    Commenting on the results, Defendant Messier stated:

<u>I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal +</u>.  Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal.  Achieving the highest level of growth in our industry is a big differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives and outperforming their peers in a difficult year.  Our 2001 results give us confidence that we can achieve our growth targets again in 2002.  [Emphasis added.]

82.     On February 12, 2002, in response to the Company's early release of positive results,

*The New York Times* reported:

"Vivendi is one of the few companies in the global media sector which has not issued a revenue or Ebitda warning," said Mark Harrington of J.P. Morgan, referring to a common measure of gross operating profit.  "So it demonstrates the structural growth of the company relative to its global media peers," he said of today's report.

83.     On March 3, 2002, Defendant Messier was quoted in the *Financial Times* as stating

that "Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling

in BSkyB and another relating to four buildings: 'There are no hidden risks and no speculative

instruments.'"

84.     On March 5, 2002, Vivendi issued a press release announcing its year-end 2001

results.  Vivendi reported a charge for impairment to goodwill under French GAAP of €12.6 billion,

including €6 billion for Canal Plus.  Vivendi also announced that revenues were up 10% and that

operating income was up 47% to €3.795 billion, on a pro forma basis.  The release stated that

"[g]iven the excellent operational results, a 1 euro per share dividend will be submitted to the

shareholders at the annual meeting."  The release further reported Media and Communications

revenues of €28.115 billion, representing 10% pro forma revenue growth, EBITDA of €5.036

billion, representing 34% pro forma EBITDA growth, and operating income of €1.838 billion,

representing 89% pro forma growth.  In addition, the release reported that Telecom's pro forma

revenue was up 24% to €8 billion, that EBITDA increased 49% to €2.5 billion, Environmental

Services revenue was up 11%to €29.1 billion and operating income increased 24% to €2.0 billion.

The release also stated in part:

> After having been the only large media company not to modify any
> of its guidance for the year 2001, Vivendi Universal reiterates its
> confidence in the strength of its businesses and their performance
> and their ability to grow. For 2002, no other new guidance will be
> expressed, apart from the company's full confidence to reach for its
> Media and Communications businesses.

85. The March 5, 2002 press release also touted the Company's "Operating Free Cash

Flow" as being "ahead of guidance" announcing Media and Communications operating free cash

flow of €2.026 billion, "up 2 billion euros over 2000." Commenting on the results, Defendant

Messier stated in part as follows:

> I am very pleased with the excellent operating results that have been
> achieved. These results confirm the strength of Vivendi Universal's
> businesses across the board despite a very difficult global economic
> environment.
>
> Most of our businesses improved market share, EBITDA and free
> cash flow during this period of global economic slowing. Even more
> important, those operational performances are showing improvement
> at every level of our P&L. The good EBITDA to EBIT
> transformation ratio: 68% of incremental EBITDA translating in
> incremental EBIT, is a strong and positive sign. The improvement
> of operational free cash-flow (FCF) at a higher rate than EBITDA
> indicate[s] the clear focus given in 2001 to cash management. We
> will continue this effort.
>
> * * *
>
> <u>We stay fully committed to conveying full transparency in our
> financial results.</u> Vivendi Universal is not only transparent but is the
> only media and communications [company] not to change its
> numbers and targets, it underscores its commitment to accurate,
> conservative and consistent reporting in every area of its operations.
> [Emphasis added.]

86. On March 5, 2002, during an investor conference call, Defendant Messier discussed

the Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted to minimize

the importance of the €12.6 billion write-down in goodwill as follows:

I just want to say a very quick points before going to your questions. And I- the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we continue or renewed on the EBITDA growth target results and add to our main in the quarter '01. We did all of this. Our operating pre cash flow target, we average Euro 2 million instead of the guidance of Euro 1.2 - 1.5 million [sic]. Obviously the fact that the more you go to cash the more we over this --- the guidance that we gave to the market is a strong sign of the quality of the casual management in working above the requirements and CAPEX management in '01. That goes to the same direction is that we did overcome largely all targets in terms of cash service. We save Euro 200 million EBITDA, we reach 300 EBITDA 100 more, and close to Euro 600 million total cash savings. The operations and these business achievements, I think that we owed them to our competitive advantages that were evident in '01. That: (1) the excellent quality of management; (2) the fact that we gain market share in about every single of our business. Those gains of market shares coming from [scale and scope]; (3) the assets mix, maximize our ability to go to digitalization for delivery on the mobile devices; and (4) to our global footprint minimizes of earnings volatility. That's the business achievement.

87.     On March 6, 2002, Lehman Brothers issued a report based in part on the statements

made by Vivendi's management in the March 5, 2002 conference call:

> In its post results conference call, management confirmed that the value adjustments to the US assets . . . reflected largely a change in accounting treatment and did not signal a negative outlook for the US water business.

88.     Similarly, Bear Stearns issued a report on March 6, 2002, based on the March 5, 2002

conference call, stating in pertinent part as follows:

> The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.

* * *

> For '02, Management reiterated their guidance of 10% organic sales
> growth for all the Media Communications businesses.  Vivendi also
> expects EBITDA of close to €6 billion (pre-USA Networks and pre-
> Stream).

89.    The statements made by Defendants referenced in ¶¶ 79-88 above, were each

materially false and misleading because, *inter alia*, the Company was engaged in improper accounting

practices which had the effect of materially overstating Vivendi's reported earnings (as particularized

below at ¶¶ 124-193), including: (a) failing to timely write-down overvalued assets from previous

corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from

its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership;

and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the

statements failed to disclose that the Company was suffering from a growing liquidity crisis (as

particularized below ¶¶ 186-193) and that Vivendi would necessarily need to restructure its debt

obligations in order to remain solvent and avoid bankruptcy.

90.    On April 24, 2002, Vivendi issued a press release announcing its "strong" first

quarter 2002 Media and Communications results.  Vivendi reported a "strong surge of operational

free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."  The release, issued in

New York, further reported that "[n]et debt fell from approximately 19 billion euros to

approximately 17 billion euros."  The release also reported Media and Communications "revenue

organic growth of 13% to 6.8 billion euros; strong EBITDA growth, up 18% to 1.1 billion euros;

and solid operating income growth, up 37% to 408 million euros."  Defendant Messier commented

on these results as follows:

> "The hard numbers in the first quarter show that Vivendi Universal
> has a winning strategy, and demonstrate our commitment to excellent
> management and delivering operating results quarter after quarter.  In
> the first quarter, each operating segment delivered its revenue targets,
> and most segments over-delivered EBITDA and operating free cash
> flow compared with their budgets . …

> In a difficult environment Vivendi Universal's businesses gained
> market share. Cash management improved dramatically. Finally, the
> revenue and cost synergies achieved in the quarter were significant.
> Further gains will be driven by improving businesses that currently
> have negative operating free cash flow: Canal+ and Internet
> operations."

91.     On April 29, 2002, Vivendi issued a press release announcing purportedly "strong"

results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to

13.2 billion euros. The release, issued in New York, also reported that consolidated operating

income grew 11% pro forma to 781 million euros, excluding goodwill amortization. In the release,

defendant Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that
> Vivendi Universal is delivering on the strategy, goals and targets that
> we have articulated to our shareholders. In the first quarter of 2002,
> both Media & Communications and Vivendi Environnement
> delivered their targets.
>
> The Media & Communications financial results released last week,
> coupled with our consolidated results issued today, are testimony to
> our ability and conviction to deliver, strong results in operations, cash
> flow, EBITDA and net income. As I said last week, because of our
> strong performance in the quarter, we are lowering our estimate of
> Media & Communications year-end Debt EBITDA ratio to less than
> 3x by December 31, 2002.
>
> In a very difficult economic environment characterized by many
> market uncertainties, Vivendi Universal's global businesses gained
> market share. In addition, strong improvement was achieved in cash
> management, debt reduction, synergies, management development
> and revenue growth.

92.     The April 29, 2002 press release further touted the Company's allegedly strong cash

flow position:

> on a pro forma basis, excluding Vivendi Universal's publishing
> businesses to be disposed of (including the B-to-B and Health
> businesses whose sale is expected to be completed in the second
> quarter), Media and Communications reported:
>
> •     A strong surge of operational free cash flow, up 159% to 1.4
>       billion euros, well ahead of expectations;

- Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget. [Emphasis added.]

93.     Following the Company's April 29, 2002 Press Release, Merrill Lynch issued a research report dated April 30, 2002 that rated the Company a "strong buy" premised on the Company's allegedly strong financial position. Specifically, the Merrill Lynch report stated that the "strong buy" recommendation was based, in part, on the fact that "Vivendi has now stated its net debt/EBITDA objective is less than 3x by the end 2002 . . . ."

94.     The statements made by Defendants referenced in ¶¶ 90-93 above, were each, materially false and misleading because, *inter alia*, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 124-193), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 186-193) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

95.     On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3, the lowest investment grade -- one notch above the "junk" status assigned to speculative investments. According to Moody's, the ratings downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

96.     That same day, Vivendi issued a press release criticizing Moody's decision and attempting to downplay its significance:

The company believes that this decision does not fully take into consideration the currently poor market conditions and the fact that the agency does not take into account immediately the whole of the debt reduction program planned by Vivendi Universal.

This decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.

Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company's totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

97.    On May 6, 2002, the *International Herald Tribune* reported:

Vivendi Universal SA could be forced to unwind billions of dollars in off balance-sheet derivatives transactions if its credit rating slips any further, according to a detailed report of the company's accounts filed with U.S. regulators.

A downgrade Friday by Moody's Investors Service Inc. of Vivendi's long-term debt to Baa3 from Baa2 places the company's bonds within a notch of junk, or non-investment-grade status. That, in turn, puts the world's second-largest media conglomerate within a hair's breadth of triggering an immediate settlement of €3.5 billion ($3.21 billion) worth of so-called total return swaps, a kind of credit derivative, documents filed last month with the Securities and Exchange Commission show. Hundreds of millions of dollars in losses on total return swaps and other esoteric derivatives deals have been the focus of at least one lawsuit filed against Enron Corp. and its auditor, Arthur Andersen LLP, by shareholders and employees of the bankrupt U.S. energy trader.

Derivatives are generally defined as financial instruments that derive their value from an underlying asset such as a stock. In a total return swap, parties make payments to each other based on an asset's appreciation and depreciation, with the payment rate determined by a complex formula. Vivendi stressed Friday that the rating change had no impact on its cash situation, adding that the move "does not trigger any renegotiation clauses or advance repayments of bank credit lines." The statement did not mention the possibility of accelerated settlement of debt or swap agreements.

Asked about the implications of a further ratings downgrade for its total return swap agreements, Antoine Lefort, a Vivendi spokesman, declined to answer Sunday, saying: "This is not the subject. Our goal is to carry through the debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating."

But in a 100-page annual financial statement filed with the SEC on April 15, Vivendi stated that it had entered into a number of long-term financing agreements that provided for early redemption if Moody's cut the company's credit rating below Baa3 or Standard & Poor's Corp. cut it below BBB-minus, its equivalent rating. S&P currently rates Vivendi at BB with a stable outlook.

Vivendi's SEC filing says, "Total return swap agreements set up at the time of the sales of BSkyB and AOL Europe provide for an early unwind if Vivendi is downgraded below BBB-minus."

The report indicates that the total notional value of the two return swap transactions was 3.51 billion as of Dec. 31. Notional principal underlying a swap is usually much greater than the true risk exposure of the parties to the transaction. Vivendi did not quantify its actual risk exposure in the report.

The swap transactions relate to the sale of investments in rival media companies ordered by EU regulators as a condition for approval of Vivendi's $34 billion acquisition of Seagram Co. of Canada in December 2000. Vivendi agreed to dispose within two years of its 22 percent stake in British Sky Broadcasting Group PLC, the satellite-television unit of Rupert Murdoch's News Corp. Last September, Vivendi arranged a complex transfer of the stake to Deutsche Bank AG of Germany in exchange for a four-year, 4.2 billion loan. Vivendi also said in the filing that it had entered into a separate two-year total return swap transaction in June 2001 in connection with the sale of $719 million worth of preferred shares in AOL Europe, an AOL Time Warner Inc. unit, to an unidentified financial institution. Further details were not provided.

98.    On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December 31, 2001 with the SEC, which was signed by defendant Hannezo. The 20-F contained Vivendi's consolidated financial statement for the year ended December 31, 2001. The 20-F also reported as follows:

*Net Cash Flow from Operating Activities* – Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings

generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities.  Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program.  In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999.  The significant improvement was primarily due to increased earnings generated by our Telecoms, Publishing and Environmental Services businesses.

*Net Cash Flow from Investing Activities* – Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000.  Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB; partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion.  In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999.  The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999 . . . .  Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

*Net Cash Flow from Financing Activities* – In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included a €5.9 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €l.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities of €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999.  The year-on-year variance was primarily due to the Merger Transactions.  In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €3.8 billion.

99.    By late-May 2002, with Vivendi's ordinary shares trading in the €31 to €33 range in response to concerns about its debt levels, Defendants once again sought to reassure financial markets by issuing the following press release on May 30, 2002:

Vivendi Universal confirms having obtained agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level.  The Company's bank credit line [is] therefore, no longer dependent on rating agencies' decisions.

Additionally, the Company has no reason to anticipate or fear any further deterioration in its credit rating.

Vivendi Universal has also confirmed that, after payment of the dividend and the acquisition of USA Networks, its available credit lines that have not been used to date amount to almost 3.5 billion euros.  Also, its use of commercial paper is limited to about l billion euros, and the reimbursement of expected debts during the coming months is limited.

This cash situation, which, the Company believes, is comfortable - even assuming an extremely pessimistic market - will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders.  [Emphasis added.]

100.    During the following weeks, however, concerns about Vivendi's debt levels continued to put downward pressure on Vivendi's securities.  In response, on June 25, 2002, Vivendi issued a press release reiterating its prior statement concerning the positive steps it had taken to reduce debt and announcing that the Company's cash position was not precarious.  The release highlighted the main points of the Company's plans as follows:

- •    DEBT REDUCTION:

- -    The active implementation of a debt-reduction plan has enabled Vivendi Universal to collect over €5.1 billion during the first half of the year, to which can be added the disappearance of its financial risk on BSkyB shares (€2.5 billion) and the imminent sale of the B2B health activities.

- -    As a consequence, net debt will be lowered in 2002 and senior management's target (under U.S. definition) is to bring it down from about €19 billion to €15 billion.

- -    That level represents a net debt-to-EBITDA ratio of below 2.5 times on a consolidated basis and of around 3 times on a proportional basis (to eliminate the impact of the minority interests in telecoms).

- •    CASH SITUATION:

- -    Vivendi Universal has €3.3 billion available in unused credit lines, an amount that well exceeds its commercial paper of €912 million.

-        Early repayment clauses in loan agreements apply to less than €170 million and the various bank covenants will all be complied with at both June 30 and December 31, 2002.

-        The Company will also continue its policy of increasing the average length of its debt.

*        *        *

## I - CHANGE IN DEBT SITUATION

1) According to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17billion at March 31, 2002, (and from €14.6 billion to €12.8 billion under French GAAP).  The main factors that will impact debt under U.S. practices in the second quarter were or will be:

-Cash inflows:
The proceeds from the sale of the BtoB and Health activities of the publishing division (VUP) for nearly €1 billion in debt, scheduled for the end of June.  The proceeds from the disposal of the Canal+ Nordic satellite platform for €270 million

-Cash outflows:
The Vivendi Universal dividend payment in May, for €1.05 billion.  The payment in May of the cash portion of the USA transaction, for €1.8 billion.

Furthermore, the restructuring of Vivendi Environnement's equity brought Vivendi Universal €1.5 billion in cash in the second quarter and will reduce net debt by the same amount at December 31, 2002.  The disposal of certain real estate assets for €120 million, committed in May, will reduce debt in the third quarter.

The total value of the disposals carried out or definitively entered into during the first half of 2002 represents more than €6 billion in cash (sale of treasury stock for €3.3billion, B2B assets for €0.9 billion, Canal+Nordic for €0.27 billion, real property assets for €0.l billion and proceeds from Vivendi Environnement of €1.5 billion).  VU's financial risk was reduced by an additional €2.5 billion when the BskyB transaction was unwound.

2) By December 31, 2002, and with the current shareholder structure of Cegetel still in place, Vivendi Universal is lowering its net debt target to below €1.5 billion (in accordance with current U.S. accounting principles), corresponding to a net reduction of over €4 billion since the beginning of the year.  This target represents a ratio of debt to estimated 2002 EBITDA of below 2.5 times, including Cegetel and Maroc Telecom, as is required by both U.S. and French accounting standards.  Using "proportional" levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA.

This new debt target, which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year.

3) In addition to transactions already finalized and its operating free cash flow, the company expects to meet its debt target by continuing to dispose of non-core assets. Certain disposals are already under way and proceeds from them, if they are all consummated before December 31, 2002, are expected to be well in excess of the amount required to meet the year-end debt target.

4) About half of Vivendi Universal's debt is in the form of securities, and the other half is in bank loans. Around 60% is in euros and 40% in dollars. The company's aim is to extend the average length of its debt, firstly by reducing it and allocating income from disposals to short-term debt repayment, and then by replacing the remaining short-term debt by medium- to long-term debt.

As a first step, carried out at the beginning of 2002, Vivendi Universal replaced €3 billion of short-term debt with a five-year syndicated loan at a spread of 47.5 basis points over EURIBOR. Vivendi Universal is planning a €1-2 billion bond issue during the year to replace short-term debt.


II – CASH SITUATION

1) At this point in time, Vivendi Universal has available around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion.

The cash situation has greatly improved since the beginning of the year. However, it should be emphasized that, even while waiting to collect the remaining proceeds from Seagram's spirits and wine business in the fourth quarter of 2001, Vivendi Universal regularly maintained an amount of unused credit lines above the value of its commercial paper.

Owing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months. In particular:

a. The sale of 15.6% of VE (for €1.5 billion) and the other planned disposals are expected to more than cover Vivendi Universal's anticipated commitments over the coming months, which include:
- making available to Cegetel cash to enable the company to buy TD if SNCF decides to exercise its put option during the summer;
- the cost in cash of paying for put options to VU relating to 15 million shares. Spread over the next seven months, this cost represents an amount at each payment date equal to the difference between the share price the day when the options are exercised and their average strike price of €69;
- the cost of the price guarantee given by Seagram on Rondor, in the amount of $230 million to be paid in March 2003.

b. The VUE bridge loan put in place at the beginning of 2002 might be refinanced by a VUE bond issue, and €1.7 billion in repayments of bank loans with maturities of less than 12 months are expected to be consolidated and/or refinanced by a planned VU bond issue.

c. When the time comes, the company will decide on how to maintain the 2006 due date of the issue of bonds convertible into VE shares, which has an early redemption option for March 2003 for holders willing to relinquish the bond's option value.

2) Furthermore, since the beginning of the year, Vivendi Universal has renegotiated a number of bank clauses, in particular those that placed it in the situation of certain loans being called if its credit ratings fell below BBB-/Baa3. These clauses originally involved €5.5 billion in debt, and now apply to less than €170 million. The renegotiations have led to a reduction in the average length of financing for marginal amounts of around €200 million. The cost of these unused back-up lines has increased by 110 basis points, only if used, depending on the amount drawn. Following the renegotiations, Standard & Poor's removed Vivendi Universal from its list of companies exposed to rating triggers.

The financial undertakings made by the company in the back-up lines are the same as those made for the five-year syndicated loan of €3 billion. Vivendi Universal is projecting for June 30 and December 31 that its financial ratios will meet or exceed the ratios required in these contracts.

Defendants also announced that it would implement a monthly Q&A session to "end the constant negative rumors about the company."

101.    On June 26, 2002, defendant Messier discussed the Company's debt and liquidity during an investor conference call as follows:

I have read, I held in the markets all certainties, question, rumors in the current environment relating to views, view for yourselves, views for your accounting and I seen that in those circumstance. <u>The best that we can do is to show you [that] there is no hidden liability that's you have all the information to come back.</u> [Emphasis added.]

102.    On June 26, 2002, the *Dow Jones International News* reported:

Chairman Jean-Marie Messier said late Wednesday that he plans to stay in charge of the embattled media company despite criticism of his strategy and a crumbling share price . . . .

Messier sought to counter those doubts, opening the call with a comment that the company has no hidden, off-balance sheet liabilities and adding, "We feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 11 months."

103.    Vivendi's June 25, 2002 press release and subsequent comments by defendant Messier reassured a number of market analysts.  For example, on June 27, 2002 Merrill Lynch issued a "strong buy" recommendation for the Vivendi's stock, stating:

> We believe the rapid share price fall of some 25% in the last two
> weeks is unwarranted and expect ongoing deleveraging and
> improving confidence in the company's short term liquidity position
> should begin to revive interest in the shares.

104.    However, statements made by Defendants referenced in ¶¶ 95-103 above, were each materially false and misleading because, *inter alia*, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 124-193), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 186-193) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

105.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default.  On July 2, 2002, *Bloomberg* reported that defendant Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting."  On July 3, 2002, Vivendi's CEO, defendant Messier was forced to resign.  Vivendi ADSs and ordinary shares collapsed upon these revelations, falling to as low as $13.40 and €13.90, and closing at $15.66 and €13.90 on huge volumes of 7.4 million and 43.6 million shares.

106.    On July 3, 2002, the Company, through its new management, published a press release acknowledging that the Company had "a short-term liquidity issue."  The release further

stated that Vivendi had to repay creditors 1.8 billion euros by the end of July 2002, and that 3.8 billion euros in credit lines were up for renegotiation:

> [I]n light of the Moody's and Standard & Poor's downgrades of Vivendi Universal debt ratings of July 1 and 2, 2002, respectively, as well as other events that have occurred over the past several days, including the resignation of Mr. Jean-Marie Messier from his positions at Vivendi Universal, Vivendi Universal believes it is important to update the investor community and the markets generally regarding its short-term cash position and liquidity . . . .
>
> As of July 3, 2002, Vivendi Universal has 1.2 billion euros of cash and 1.6 billion euros in unused credit lines of which at least 600 million euros can be used for general corporate purposes and the rest can be used as backing for certain types of its commercial paper (400 million euros of which is currently outstanding).
>
> Payments totaling approximately 1.8 billion euros remain due by the end of July. These will be financed from resources totaling approximately 2.4 billion euros comprising cash and draw-downs on existing credit facilities.
>
> Several of Vivendi Universal's credit lines automatically roll over at certain specific dates in accordance with their terms, subject to standard material adverse change provisions. Of those, approximately 3.8 billion euros are scheduled to roll-over in July. In addition, Vivendi Universal has initiated discussions with its main credit banks with a view to putting in place new credit facilities as soon as feasible.
>
> While Vivendi Universal has a short-term liquidity issue, the value of the group's broad and diversified assets by far exceed that of its debt. The new management is committed to a program of aggressive deleveraging and greater transparency in order to restore health and confidence in Vivendi Universal.

107.    On July 3, 2002, in *The Columbian*, Messier continued to defend Vivendi's financial statements: "There are no underestimated liabilities. There are no overvalued assets," Messier said. "Our results are true, genuine and complete."

108.    On July 5, 2002, the *Globe and Mail Metro* reported:

> With new management in place, Vivendi Universal SA finally admitted what its ousted chairman and chief executive officer, Jean-

Marie Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is ill danger of a cash crunch.

Based on a detailed liquidity statement Vivendi put out late Wednesday, credit analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros ($2.64 billion U.S.) by the end of the year, expanding to as much as 5.5 billion euros by the middle of 2003, unless it can quickly secure a new multibillion-euro credit line from its lenders.

The statement came after a three-hour board meeting late Wednesday in Paris where the Vivendi board-accepted the forced resignation of Mr. Messier. The board, as expected, chose Jean-Rene Fourtou, a top executive of Aventis SA, the Franco-German pharmaceutical giant, as its new CEO.

In its statement, Vivendi said it must repay 1.8 billion euros this month and said the payment would be financed from 2.4 billion euros in existing cash and credit lines. It also has a 3.8-billion-euro credit line that will roll over this month unless the banks determine there has been a "material adverse change" with the company.

This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi-owner of Universal Studios, Universal Music Group, USA Networks and minority stakes in a host of other assets-was "comfortable even in the most pessimistic market hypotheses." [Emphasis added.]

109.    The statements made by Defendants referenced in ¶¶ 105-108 above, were each materially false and misleading because, *inter alia*, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 124-193), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶186-193) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

110.    On August 14, 2002, the Company's new management stated that, pursuant to French GAAP, Vivendi suffered a €12 billion net loss for the first half of 2002 and would take an €11 billion goodwill write-down of depreciated assets.  Debt-rating agency Standard & Poor's slashed Vivendi's long-term corporate credit to junk status that same day.  As the *Associated Press* reported on August 14, 2002:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will sell $10 billion in assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin.  Adding insult to injury, a ratings agency downgraded the company's debt to junk.…
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions.  In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets - half of them within nine months, the rest within two years.
>
> "We are facing a liquidity problem," said chairman Jean-Rene Fourtou, who took over July 3 after Messier's ouster.  Fourtou said he would "try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered."

111.    In response to these further stunning developments, on August 14, 2002, Vivendi common stock closed at €11.89, down more than €4 (or approximately 25%) from its close the previous day.  Vivendi's ADSs suffered a similar decline closing down $3.67 and $11.66

**SEC Investigation, Settlement and Fines**

112.    On December 24, 2003, the SEC announced that it had settled an enforcement action against Vivendi, and the Individual Defendants (the "SEC Settlement").

113.    Pursuant to the SEC Settlement, Vivendi consented to pay a $50 million civil money penalty.  Further, pursuant to the SEC Settlement, Messier agreed to relinquish his claim to a  €21 million severance package that he had negotiated before his forced resignation on July 2, 2002.

114.    Prior to the SEC Settlement, in or around September 16, 2003, the SEC had filed an application pursuant to Section 1103 of the Sarbanes-Oxley Act, in the Southern District of New York seeking an order compelling Vivendi to place in escrow (in an account subject to Court supervision) any extraordinary payments that Vivendi may make to Messier, including Messier's severance payment.   On September 24, 2003, on the SEC's motion, the Court ordered Vivendi to place these funds in escrow.

115.    Further, pursuant to the SEC Settlement, Messier is required to pay a civil penalty of $1,000,000 and Hannezo is required to disgorge $143,149 in past bonus payments and to pay a penalty of $120,000.  Moreover, Messier is prohibited from serving as an officer or director of a public company for 10 years and Hannezo is prohibited from serving as an officer or director of a public company for 5 years.

116.    The SEC Settlement also enjoins Defendants from further violations of the Federal Securities laws.

117.    The Defendants consented to the SEC Settlement.

118.    The SEC Complaint against the Defendants, which resulted in the SEC Settlement, alleged claims against the Defendants for financial misrepresentations like those alleged herein, among them:

- During 2001 and the first half of 2002, Vivendi issued misleading press releases authorized by Messier, Hannezo, and other senior executives. The press releases falsely portrayed Vivendi's liquidity and cash flow as "excellent" or "strong" and as sufficient to meet Vivendi's future liquidity requirements, were misleading in light of Vivendi's inability unilaterally to access the cash flow of two of its most profitable subsidiaries, a situation that substantially impaired Vivendi's ability to satisfy its debt burden and other operating costs.

- Vivendi, at the direction of its senior executives, made improper adjustments that raised Vivendi's EBITDA by approximately €59 million during the second quarter of 2001 and by at least €10 million during the third quarter of

2001. These adjustments were made so that Vivendi could meet ambitious earnings targets that it had communicated to the market.

- Vivendi failed to disclose future financial commitments regarding two of its subsidiaries. Vivendi failed to disclose the commitments in Commission filings and in meetings with analysts. If Vivendi had revealed those commitments, they would have raised doubts about the company's ability to meet its cash needs.[2]

119.    In relation to the SEC Settlement, the director of the SEC's Southeast Regional Office in Miami, David Nelson, stated "Our lawsuit today demonstrates that even the most complex schemes involving foreign issuers will be uncovered and pursued." (Chinadaily.com.cn, *Vivendi, Messier Settle SEC Charges*, 12/24/2003).

**French Investigations and Convictions**

120.    On July 9, 2002 *Bloomberg* reported that French stock regulators, *Commission des Operations de Bourse* ("COB"), now the AMF, launched an investigation into Vivendi's statements and financial condition.  French regulators raided Vivendi's Paris headquarters as part of the investigation into whether Vivendi had disclosed all relevant information to investors in the prior 18 months.  The AMF charged that Messier had "deceived the public" and had "'deliberately issued in the company name inexact and falsely optimistic information on the consolidation of Telco and (Vivendi's) debts, cash flow and outlook between October 2000 and April 2002." (*Corporate Ethics and Governance*, December 7, 2004 (http://www.icego.org/details/vivendi and its former boss fined.html).  The actions of the AMF resulted in convictions of both Vivendi and Messier.  These convictions were confirmed by both the French Court of Appeals and the French Supreme Court (*Cour de cassation*) and both Messier and Vivendi were fined €500,000 and, at a minimum, €300,000, respectively.

---

[2] http://www.sec.gov/litigation/litreleases/lr18523.htm

121.    In addition, on October 29, 2002, *Bloomberg* reported that French prosecutors had opened a criminal investigation:

> "The investigation will examine whether Vivendi `published false accounts from 2000 and 2001 to hide the true nature of its financial situation,' a spokeswoman for the prosecutor's office said.  It will also look at whether the Paris-based company gave misleading outlooks for 2001-2002."

122.    On December 12, 2002, *Bloomberg* further reported that a police team from the Finance Brigade of the Paris Public Prosecutor's office had raided both Vivendi's headquarters in Paris as well as Messier's home.  The Finance Brigade also raided Canal Plus's headquarters the next day, as well as the homes or offices of various Vivendi directors.  This criminal case is currently pending and is in the investigation phase under the supervision of 2 independent criminal judges (*Juges d'Instruction*).  Messier was held in custody for 2 days during which he was interrogated regarding claims of securities fraud and a $2 billion share buyback by Vivendi in 2001.  Hannezo had also been placed under formal investigation.

123.    At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs.  As described herein, Defendants made or caused to be made a series of materially false or misleading statements about Vivendi's business, prospects, operations and financial condition.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements resulted in Plaintiffs purchasing or otherwise acquiring the Company's ordinary shares and ADSs at artificially inflated prices, thus causing the damages complained of herein.

## VIVENDI'S MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS AND RELATED FINANCIAL MISREPRESENTATIONS

124.    Vivendi filed financial statements with the SEC which were represented to have been prepared in conformity with GAAP in France ("French GAAP") during the Relevant Period.  The SEC allows foreign private issuers, such as Vivendi, to prepare their primary financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that an understanding of such financial statements is facilitated via a reconciliation to U.S. GAAP.

125.    The SEC requires that each annual financial statement filed on Form 20-F and each annual and interim financial statement included in an SEC registration statement be reconciled to U.S. GAAP.  Vivendi's 1999, 2000 and 2001 annual financial statements filed on Form 20-F, represented to have been prepared in conformity with French GAAP, were purportedly reconciled to U.S. GAAP.  In addition, Vivendi's 2001 Form 20-F, which was signed by defendant Hannezo, represented that, beginning in 2002, the Company's financial information would be communicated on a U.S. GAAP basis and be reconciled to French GAAP.

126.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, ¶42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

127.     Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  The representations by the Defendants that Vivendi's financial statements were reconciled to U.S. GAAP  were materially false and misleading because the financial statements materially inflated and distorted the Company's true financial performance, as described herein.

128.     In violation of U.S. GAAP and SEC accounting rules and regulations, Vivendi misstated its financial statements and masked the Company's liquidity crisis.  Defendants caused Vivendi's employees to engage in a myriad of improper accounting practices, and/or knowingly acquiesced in and condoned such practices.  These practices concealed the truth about the then current state and future prospects of the Company's business.

**(a)     Vivendi's Improper Failure to Timely Record Impaired Goodwill**

129.     Vivendi's financial statements during the Relevant Period were materially false and misleading and presented in violation of U.S. GAAP and SEC rules and regulations because the Company failed to timely record an impairment in the value of its reported goodwill.  In so doing, Vivendi misled investors about cash flows it expected to receive from certain of its recent acquisitions.

130.     As noted above, prior to and during the Relevant Period, Vivendi engaged in an acquisition spree, which, in the aggregate, resulted in the acquisition of interests in other entities that Vivendi valued in excess of ***$77 billion***.  Vivendi utilized the "purchase method" of accounting for these acquisitions.  The purchase method, as set forth in then existing U.S. GAAP's Accounting Principles Board ("APB") Opinion No. 16, ¶11[3] provides that:

---

[3]  APB Opinion No. 16 has been superseded by FASB's Statement of Financial Accounting Standard ("SFAS") No. 141. However, SFAS No. 141 carries forward, without reconsideration, the guidance in APB Opinion No. 16 (and certain of its amendments and interpretations) related to the application of the purchase method.

> The acquiring corporation records at its cost the acquired assets less
> liabilities assumed.  A difference between the cost of an acquired
> company and the sum of the fair values of tangible and identifiable
> intangible assets less liabilities is recorded as goodwill.

131.    Accordingly, for purposes of accounting for an acquisition transaction, the acquiring

entity records the acquired assets (both tangible assets and identifiable intangible assets) and

liabilities assumed at their respective fair values, and the difference between the cost of the acquired

entity and the respective fair values of the acquired assets, less liabilities, is recorded as goodwill.

Pursuant to APB Opinion No. 16, the cost of the acquired entity for accounting purposes is

determined by the fair value of the consideration acquired or issued, whichever is more objectively

determinable.

132.    Paragraphs 74-75 of APB Opinion No. 16 further provide:

> The fair value of securities traded in the market is normally more
> clearly evident than the fair value of an acquired company.  Thus, the
> quoted market price of an equity security issued to effect a business
> combination may usually be used to approximate the value of an
> acquired company.
>
> *       *       *
>
> If the quoted market price is not the fair value of the stock ..., the
> consideration received should be estimated even though measuring
> directly the fair values of the assets received is difficult.

133.    Purporting to apply these principles, Vivendi reported that it recorded goodwill as

follows when it acquired US Filter, Seagram and Canal Plus:

(a)    US Filter acquisition -    € 4.6 billion

(b)    Seagram acquisition -    € 25.9 billion

(c)    Canal Plus acquisition -  € 12.6 billion

**(i)    Canal Plus**

134.    With respect to the acquisition of Canal Plus in December 2000, Vivendi valued the

cost of Canal Plus at approximately € 12.5 billion.  More than 100% of this cost, or € 12.6 billion,

was recorded by Vivendi as goodwill. As required under the purchase method, Vivendi's reporting of € 12.6 billion of goodwill on Canal Plus, when the accounting cost of Canal Plus totaled € 12.5 billion, indicated that the fair value of Canal Plus' liabilities exceeded its assets by approximately € 100 million.

135.    In the fourth quarter of 2001, Vivendi recorded a € 6.0 billion charge for an impairment in the value of Canal Plus's goodwill under French GAAP. This was followed by an additional € 3.8 billion charge under French GAAP for an impairment in the value of Canal Plus's goodwill during the quarter ended June 30, 2002. Accordingly, by June 2002, Vivendi had written off € 9.8 billion, or approximately 78%, of the total € 12.5 billion cost to acquire Canal Plus under French GAAP.

136.    However, although Vivendi recognized an initial impairment to goodwill under French GAAP in the fourth quarter of 2001, Vivendi did not take any write-off for impaired goodwill under U.S. GAAP in 2000 or 2001. As the Company purported to explain in its 2001 year-end financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-Lived Assets*
> As required under both French and U.S. GAAP [*see* SFAS No. 121] Vivendi Universal reviews the carrying value of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable. Under French GAAP, measurement of any impairment is based on fair value. In 2001, following the recent market decline, particularly in the Internet, media and telecommunications industries, our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest). Under U.S. GAAP, measurement of any impairment is based on the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, *Accounting for the Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed Of* (SFAS 121). SFAS 121 requires that an impairment loss be recognized whenever the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of an asset are less than the net carrying value of the asset.

<u>On this basis no impairment was indicated and accordingly the
goodwill impairment charge was reversed</u>.  [Emphasis added.][4]

137.    Accordingly, on March 5, 2002, when the Company initially announced its FY 2001

results and € 12.6 billion goodwill impairment write-off under French GAAP, and again on May 28,

2002, when the Company filed its Form 20-F with the SEC, Vivendi -- by refusing to take any

goodwill impairment write-offs under U.S. GAAP -- effectively represented to investors that the

cash flows Vivendi expected to receive from the assets it acquired prior to and during the Relevant

Period equaled or exceeded the carrying value of such assets.

138.    In reality, however, Defendants knew or recklessly ignored from the beginning of the

Relevant Period that cash flows that they expected from Canal Plus and other acquisitions would

***not*** equal or exceed the carrying value of those entities.

139.    For example, as set forth in a complaint ("the March 2002 Complaint") filed by

Canal Plus in the United States District Court for the Northern District of California in March 2002,

Defendants knew or recklessly disregarded that an entity known as NDS Group PLC ("NDS") had,

since March 1999, "permitted and facilitated the proliferation of counterfeit smart cards that enabled

users to circumvent the security measures built into the Canal+ conditional access system," causing

Canal Plus to suffer losses of over a billion dollars.  According to the March 2002 Complaint:

> Through the investment of millions of dollars and thousands of man-
> hours into research and development, Canal+ was able to implement
> effective security measures in its smart cards used to control access to
> digital television signals.  These measures proved to be more than
> adequate to protect Canal+' smart cards from piracy <u>until March
> 1999</u>, when Canal+' smart card software code was copied and

---

[4]  Vivendi's December 31, 2001 financial statements also stated:

On January 1, 2002, Vivendi Universal will adopt SFAS 142, which provides new measurement
techniques for goodwill and other intangible assets resulting from business combinations. While its
evaluation is not yet complete, Vivendi Universal expects to record a non-recurring, non-cash charge of
approximately € 15 billion in the first quarter of 2002 to U.S. GAAP net income. The impairment reflects
the overall market decline which has occurred since the Vivendi, Seagram and Canal Plus merger was
announced in June 2000. The charge will be recorded as a cumulative effect of change in accounting
principle and will have no affect on Vivendi Universal's operations.

published on a web site called "DR7.com." Thereafter, counterfeit
Canal+ smart cards began to appear on the market. The proliferation
of these counterfeit cards resulted in massive harm to Canal+ and to
the system operators who depend on the security of Canal+ 'smart
cards . . . .

If smart card pirates obtain Canal+' new software code, the damage
to Canal+ will be irreparable. What is released to the public cannot
be put back in the bottle. The market for counterfeit smart cards is
massive and the harm from such activities is global. [Emphasis
added]

140.    As Canal Plus has further alleged:

Canal+ seeks redress in this action for the damage caused by its
competitor, NDS. Through the calculated expenditure of millions of
dollars for specialized equipment and other resources, NDS
sabotaged C+ Technologies' [Canal Plus Technologies'] previously
unbroken security system for access to digital television signals. In
apparent disregard for both the law and its own reputation, NDS
caused the development of counterfeit "smart cards," permitting a
theft of digital television on a massive scale. Canal+ estimates that
Defendants' illegal conduct has caused it harm in excess of
$1,000,000,000.

                    *        *        *

C+ Technologies has spent substantial time and money developing
countermeasures to combat each type of pirate smart card that
resulted from the publication caused by NDS. These
countermeasures are created by a team of C+ Technologies engineers
and then tested and broadcast by the digital television operators to
stop unlawful television viewing by counterfeit card consumers. The
countermeasures, however, are quickly made obsolete by new
versions of software for the counterfeit cards that pirates make
available after analyzing the countermeasures. Counterfeiters are able
to quickly and effectively respond to each new countermeasure
because they have access to the UserROM code published on
DR7.com. C+ Technologies cannot stop this counterfeiting without
implementing a fundamental change in the design of the smart card.
At enormous expense, C+ Technologies is currently developing a
new smart card design and will soon transition its existing network to
the new design. This transition will be consuming and expensive
because each and every legitimate smart card will have to be
exchanged.

The mass production of counterfeit C+ Technologies smart cards
has damaged not only Groupe Canal+'s direct revenue through its

<u>digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA.</u>  Conditional access system competitors, especially NDS, use the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators.  For example, Canal+ has encountered competitors, including NDS, pointing out to customers and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems.  In highlighting this supposed security breach, Defendants have deceptively failed to disclose that the breach exists solely because of Defendants' own unlawful sabotage.

<u>As a result of the counterfeiting, Canal Plus has lost sales opportunities and has lost customers to its competitors.</u>  NDS has also used the counterfeiting to attempt to disrupt Canal Plus' relationships with existing customers.

Another loss occasioned by NDS to Groupe Canal Plus is the loss of pay per view subscriptions.  One common type of counterfeit access is a modification of a legitimate smart card.  These cards, commonly referred to as "MOSC" cards (*i.e.* "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased.  Some MOSC cards grant free access to upgraded packages or to every subscription channel; others have a number of pay per view television "credits" for which the owner has not paid.  These cards did not exist before the publication on DR7.com and but for that publication they would not have been produced.  <u>The widespread use of MOSCs has caused Group Canal Plus and pay television operators from the Canal Plus group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.</u>  [Emphasis added.]

This known piracy of Canal Plus' technology confirms that Vivendi's goodwill was overstated long before the end of FY 2001, when Vivendi first recorded a € 6.0 billion impairment in the value of goodwill on its acquisition of Canal Plus.

141.    Similarly, according to a declaration filed on May 13, 2002 in connection with Canal Plus' action against NDS, Jean-Marc Racine, the Director of Marketing for Canal Plus, and former CEO of Canal Plus, stated:

[J]ust as Canal+ was getting a foothold in the U.S., the piracy of our conditional access system became known and Canal+' efforts to gain U.S. market share, based out of Milpitas and later Cupertino, were negatively impacted.  <u>A company's reputation, as well as market perception of the quality of its product, is important in order to win new business, and the piracy of Media Guard had a negative impact on Canal+</u>.

I had several experiences with Canal+ customers that to me evidence the impact of the piracy of MediaGuard on Canal+' Northern California operations.  For example, Canal+ Technologies, Inc. expended a great deal of resources trying to win a contract with Cablevision in New York.  We lost this contract to NDS, and Cablevision told us that it was choosing NDS because NDS knew how to combat piracy better than Canal+.  In another instance, I believe that NDS actively flaunted the hacking of Canal+' conditional access system when it was in competition with Canal+ to win a full end-to-end system contract from RCN, an over-builder based in Princeton, New Jersey, which has significant operations in major U.S. cities, including San Francisco.  Canal+ Technologies, Inc.'s only real competition for the RCN business was NDS.  Several times, RCN, which was in contact with NDS at the time, mentioned the piracy of MediaGuard that had occurred after our codes were published on DR7.  On May 29, 2001, RCN asked us to comment on several articles and other information contained on web sites regarding the hacking and counterfeiting of Canal+' smart cards . . . .  This set of articles is extensive and had to take more than a few hours to prepare.  It was sent by an RCN engineer who I believe was also in contact with NDS in this competition with Canal+.  RCN asked us to justify why there was a piracy problem with our smart cards and told us that NDS had a much better solution and no piracy problem in Europe.  RCN postponed their decision on selecting a supplier for a new end-to-end system, but I believe that the piracy problem caused confusion and created doubts at RCN about the performance and quality of Canal+' products.

<u>Since then, Canal+ Technologies, Inc. has successfully won only one contract in the United States,</u> WinFirst in Sacramento.  As the piracy of MediaGuard became known, we have put management time and efforts into reassuring the customer.  We had to set up a Security Committee and explain to the customer how to fight piracy, the legal actions taken in Europe, and the engineering steps that we would use and were using to combat piracy.  These efforts would not have been needed if MediaGuard had remained secure.  The security problems associated with our conditional access system[s] have had a negative impact on the sales efforts in the United States of Canal+ Technologies, Inc. based in Cupertino.  [Emphasis added.]

142.    In addition, on March 2, 2001, *New Media Markets* reported:

> Some estimates put the level of piracy as high as 30 per cent of the
> pay-television - subscriber base in Western Europe.
>
> *        *        *
>
> The impact of piracy was made clear last month by Spanish pay-
> television group Sogecable, which runs both the Canal Satelite Digital
> digital-satellite platform and the Canal Plus Espana premium service.
> The company, which has just over two million subscribers, said that
> pirate cards were being used by between 100,000 and 300,000 homes
> in Spain.  This is hurting the premium channel and pay-per-view
> services in particular.  [Emphasis added.]

143.    Despite the foregoing, when Vivendi reported its results for the quarter ended

March 31, 2002, the Company disclosed:

> Canal+ Premium Channel revenue fell 3% in the quarter because of
> lower advertising revenue and lower subscription revenue owing to
> lower average analogue subscribers.

In truth and in fact, Canal Plus Premium Channel revenue was materially adversely affected by the

undisclosed piracy of Canal Plus' technology noted above.

144.    Moreover, although Defendants caused Vivendi to belatedly record goodwill

impairments totaling € 16.6 billion in the first quarter of 2002 under U.S. GAAP -- after having

taken *no* impairment charges under U.S. GAAP in FY 2001 -- defendants downplayed the

significance of these write-offs by attributing them to the adoption of a new U.S. GAAP accounting

standard, SFAS No. 142, under which impairment is principally evaluated by reference to cash flow

impairment.(Pursuant to SFAS No.142, the fair value of a reporting unit is compared to its carrying

amount. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting

unit is considered not impaired. If the carrying amount of reporting unit's goodwill exceeds the

implied fair value of that goodwill (as defined), an impairment loss shall be recognized in an amount

equal to that excess.) By delaying any recognition of goodwill impairment under U.S. GAAP until

after Vivendi had adopted SFAS No. 142, Defendants avoided having to admit that Vivendi's

expected cash flows from its acquisitions had been materially impaired well before its adoption of the new accounting standard.

145.    In addition, during 2000 and 2001, the world-wide economy suffered significant contraction and experienced a dramatic slowdown in the Internet, pay TV and telecommunications sectors.  In fact, shortly after Vivendi issued its 2001 year end financial results, Moody's downgraded Vivendi's debt out of concerns about the Company's ability to service its debt as it became due.

146.    Moreover, after Messier and Hannezo left the Company, Vivendi recorded an additional € 3.8 billion impairment in the value Canal Plus' goodwill at the end of the first half of 2002 under French GAAP, when Canal Plus actually reported revenue growth of 8% during this period.  The fact that Vivendi's new management took additional write-offs of goodwill at Canal Plus during a period when Canal Plus' business was actually improving is further evidence that the impairment recorded in the value of Canal Plus' goodwill in the second half of 2002 should have been taken earlier.

147.    The reported value of Canal Plus' assets on Vivendi's balance sheet was also materially and improperly inflated in other respects.  For example, in 1999, Canal Plus entered into contracts with five French football (soccer) league clubs: Monaco, Lyon, Lens, Bordeaux and Paris-St. Germain.  These agreements obligated Canal Plus to pay €250 million over the next five years for "marketing rights" related to those teams, and these rights were reported as assets in Vivendi's financial statements.

148.    However, according to a January 29, 2001 memorandum that was prepared shortly after Vivendi acquired Canal Plus in December 2000, and that was reviewed by defendant Hannezo, the purported "marketing rights" had no economic benefit to Canal Plus because the rights primarily at issue turned out to belong to the football league, rather than to the individual clubs.  The memo also stated that the contracts had not been properly authorized by Canal Plus' board.  The memo

further warned that, given the lack of economic benefit that could be documented in connection with these contracts, the contracts could put Vivendi in a "difficult" position with respect to the SEC and U.S. GAAP reporting requirements.

149.    Pursuant to U.S. GAAP, assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events. *See* Concepts Statement No. 6. As described in the January 21, 2001 memorandum, however, there were no meaningful economic benefits flowing from these five accounts.

150.    Accordingly, the marketing rights in the amount €250 million, reported as assets in Vivendi's financial statements were not *bona fide* "assets" at all, and were required to be written-off and charged to expense in Vivendi's year-end financial statements for FY 2000 (which were filed with the SEC on July 2, 2001). Nonetheless, Vivendi improperly failed to do so in violation of U.S. GAAP.

        **(ii)**    **US Filter**

151.    Just as it did with Canal Plus, Vivendi also overstated its reported goodwill on its US Filter acquisition. For example, when Vivendi acquired US Filter, it paid approximately 46 times US Filter's 1998 earnings. As a result, Vivendi recorded approximately €4.6 billion in goodwill on the US Filter acquisition. However, as Defendants knew or recklessly ignored, Vivendi's reported goodwill on US Filter was materially inflated during the Relevant Period because, among other things (a) US Filter's operating results were much less than reported by Vivendi as US Filter was falsely inflating its revenue, as noted below at ¶¶ 174-185, and (b) because companies comparable to US Filter were sold during the Relevant Period at prices significantly less than that paid by Vivendi. (For example, although Vivendi paid 46.5 times US Filter's purported operating profit when Vivendi acquired it in September 1999, in 2001 the German conglomerate RWE purchased a comparable U.S. water utility, American Water, for only about 16 times earnings before interest and taxes).

These events and circumstances confirmed that US Filter's goodwill was impaired under US GAAP prior to the fourth quarter of 2001. In the end, Vivendi recorded a staggering €2.6 billion impairment in the value of US Filter's assets, but, in violation of U.S. GAAP, did not record this impairment until the end of the fourth quarter of 2001.

152.    After Vivendi's board ousted Messier and Hannezo, Vivendi's new management also implicitly admitted that the goodwill impairments that prior management had recognized for entities other than Canal Plus and US Filter were also insufficient. For example, on August 14, 2002, Vivendi reported additional goodwill impairments (exclusive of those pertaining to Canal Plus) totaling €7.2 billion on a French GAAP basis for the three months ended June 30, 2002. In contrast, the Company's financial statements for the three months ended March 31, 2002 (prepared on a French GAAP basis) showed that no charge for goodwill impairment was recognized during the March 31, 2002 quarter.

**(b)    Vivendi's Improper Consolidation Of Investments**

153.    Vivendi also improperly inflated its 1999, 2000 and 2001 revenues and operating income by consolidating certain investments in which the Company possessed less than a 50% ownership interest.

154.    Specifically, although Vivendi only owned a minority of the shares of the French telecommunications company Cegetal and the Moroccan telecommunications company Maroc Telecom, the complete results of Cegetal were included in Vivendi's consolidated financial statements for 1999, 2000 and 2001 and the complete results of Maroc Telecom were included in Vivendi's consolidated financials for 2001.

155.    In the footnotes to its 1999, 2000 and 2001 financial statements filed with the SEC on Form 20-F, Vivendi disclosed the full consolidation of the following companies:

| OWNERSHIP INTEREST | | | |
|---|---|---|---|
| **Name** | **1999** | **2000** | **2001** |
| Cegetel & Subsidiaries | 44% | 44% | 44% |
| Maroc Telecom | - | - | 35% |

(*See* Vivendi's 1999 20-F Pages 183-184; 2000 20-F Pages F39-F40; 2001 20-F Pages F48-F-49.)

156.    U.S. GAAP, in Accounting Research Bulletin ("ARB") No. 51, provides:

> The purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries essentially as if the group were a single company with one or more branches or divisions.  There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

157.    ARB No. 51, as amended by FASB's SFAS No. 94, also provides, in pertinent part, that:

> The usual condition for a controlling financial interest is ownership of a majority voting interest, and, therefore, as a general rule ownership by one company, directly or indirectly, of over fifty percent of the outstanding voting shares of another company is a condition pointing toward consolidation.

158.    In addition, the Emerging Issues Task Force ("EITF") of the FASB has issued Abstract No. 96-16, which provides accounting guidance for when minority shareholders possess certain rights which may overcome the presumption that consolidation requires a majority voting interest in an investee.  In this regard, EITF No. 96-16 provides, in pertinent parts:

> The Task Force believes that minority rights (whether granted by contract or by law) that would allow the minority shareholder to effectively participate in the following corporate actions should be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:
>
> 1.    Selecting, terminating, and setting the compensation of management responsible for implementing the investee's policies and procedures; and

2.    Establishing operating and capital decisions of the investee, including budgets, in the ordinary course of business.

The Task Force considered the above to be illustrative of substantive participating rights, not necessarily all-inclusive.  The Task Force believes that the rights noted above are participating rights because, in the aggregate, the rights allow the minority shareholder to effectively participate in decisions that occur as part of the ordinary course of the investee's business and are significant factors in directing and carrying out the activities of the business.  Individual rights, such as the right to veto the termination of management responsible for implementing the investee's policies and procedures, should be assessed based on the facts and circumstances to determine if they are substantive participating rights in and of themselves.  However, minority rights that appear to be participating rights but that by themselves are not substantive (see "Factors to Consider" and Exhibit 96-16A) would not overcome the presumption of consolidation by the investor with a majority voting interest in its investee.  The likelihood that the veto right will be exercised by the minority shareholder should not be considered when assessing whether a minority right is a substantive participating right.

159.    In addition, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results. Furthermore, French GAAP states that enterprises are **excluded** from consolidation where severe and long lasting restrictions substantially call into question the control or influence exercised over the enterprise.  (See Regulation 99-02 Section 1002, 101.)

160.    Vivendi did not possess controlling financial interests in, at least, its Cegetel and Maroc Telecom subsidiaries and therefore should not have consolidated the financial statements of such companies with its own.  In so doing, Vivendi overstated its reported revenue, operating income and EBITDA and inflated its reported growth rates throughout the Relevant Period.

161.    Consolidating the financial statements of these investments was critical to Defendants' scheme because it allowed Vivendi to include all of the revenues and operating income from these investments in its financial results.  Indeed, this accounting practice artificially and materially inflated Vivendi's revenues and income because Vivendi did not possess control over such

investments nor did it have access to their reported cash.  As a result, not only was Vivendi's revenue and earnings inflated, its liquidity crisis was much worse than portrayed in the Company's publicly filed financial statements.

**Cegetel**

162.    Vivendi stated in its December 31, 2000 20-F that:

> The Company consolidates Cegetel . . . in which it owns less than 50% of the voting shares.  The Company has a direct and indirect ownership interest in Cegetel totaling 44%.  Cegetel is consolidated because, through a shareholders agreement, the Company has a majority of the shareholder voting rights.

163.    This statement and the consolidation of Cegetel's 1999-2001 operating results were false and misleading because Vivendi only owned 44% of Cegetel shares and it did not have sufficient controlling financial interest in Cegetel.  Indeed, the Shareholder Agreement between Vivendi and Cegetel, as described in Vivendi's 2000 20-F, contained a key clause that blocked Vivendi from making operating and capital decisions in the ordinary course of Cegetel's business.

164.    The clause states:

- If all of BT, Mannesmann and Transtel dissent, we [Vivendi] cannot cause Cegetel Group to:
  - create or acquire shares in any entity in which Cegetel Group or companies it controls hold less than 100% of the shares and voting rights; or
  - subject to some exceptions, acquire, dispose of lease or loan a material amount of assets or significantly reduce or cease any material business operation.  [Emphasis added.]

165.    Additionally, Vivendi lacked the necessary financial control of Cegetel for it to have access to Cegetel's cash flow.  When asked about the liquidity of the Company, Vivendi's CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that "we do not have access to *Cegetel* and Maroc Telecom."  In an August 14, 2002 conference call with investors,  Jean-Rene Fourtou also conceded that "Vivendi cannot access the cash flow generated by the Companies [of which] it owns less than 50%."

166.     It was not until after the Relevant Period, on December 3, 2002, that Vivendi announced that it *would* purchase sufficient number of shares to give it a ***majority stake*** in Cegetel, and to finally give Vivendi the necessary financial control over Cegetel's cash flow.

167.     As a result of Vivendi improperly consolidating Cegetel's financial statements, Vivendi's reported revenues were overstated by € 3.9 billion, € 5.1 billion and € 6.4 billion for the years ended 1999, 2000, and 2001, respectively.  This reported $16.8 billion in additional revenue impacted and misrepresented other financial metrics relied upon by investors, including Plaintiffs, namely, revenue growth and EBITDA.

**Maroc Telecom**

168.     Vivendi disclosed in its 2001 20-F that:

> In the course of the partial privatization of Maroc Telecom, Vivendi Universal was chosen to be a strategic partner in the purchase of an interest in Morocco's national telecommunications operator for approximately €2.4 billion.  The transaction was finalized in April 2001, at which time Maroc Telecom began to be consolidated in the accounts of Vivendi Universal, as we obtained control through majority board representation and share voting rights.  As a leader in Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines, has 3.7 million GSM clients and generated revenues of approximately €1.4 billion in 2001.

169.     Vivendi also disclosed in its 2001 Form 20-F that no other shareholder or groups of shareholders exercise substantive participatory rights, which would allow them to vote or block decisions taken by Vivendi Universal.

170.     This disclosure and the consolidation of Maroc Telecom's 2001 results were false and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining 65% was held by a single entity - the Moroccan government.  The Moroccan government did not conduct its operations based on the views of Vivendi.

171.     Additionally, under French GAAP, at least a 40% ownership interest is required for consolidation (Regulation 1002), but Vivendi only had a 35% interest.

172.    As with Cegetel, Vivendi lacked the necessary financial control of Maroc Telecom for it to have access to Maroc Telecom's cash flow.  When asked about the liquidity of the Company, Vivendi's CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that "we do not have access to Cegetel and *Maroc Telecom*."  [Emphasis added.]  In an August 14, 2002 conference call with investors, Jean-Rene Fourtou similarly stated that "Vivendi cannot access the cash flow generated by the companies it owns less than 50 percent of."

173.    As a result of Vivendi improperly consolidating Maroc Telecom's financial statements, Vivendi's reported revenues were overstated by € 1.4 billion in 2001.

**(c)    Vivendi's Improper Recognition Of Revenue**

174.    In furtherance of its scheme to inflate its operating performance, Vivendi, in violation of U.S. GAAP, improperly recognized revenue from, at least, its US Filter subsidiary.

175.    U.S. GAAP provides that revenue should not be recognized until it is realized or realizable and earned.  FASB Concepts Statement No. 5, ¶ 83.  The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or *services have been rendered*, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue.  Generally, revenue should not be recognized until the earnings process is complete.  SEC Staff Accounting Bulletin ("SAB") No. 101; Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion No. 10; and SOP 97-2.

176.    In fact, the SEC's SAB No. 101 specifically provides that:

> Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services.  The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment.  Therefore, the up-front fee and the continuing performance obligation related to the

services to be provided or products to be delivered are assessed as an integrated package.  In such circumstances, <u>the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance.</u>  [Emphasis added; footnotes omitted.]

177.    In its December 31, 2001 Form 20-F, the Company disclosed the following with respect to its accounting policy associated with the recognition of environmental service revenue:

Revenues on public service contracts are recognized as services are provided.  Amounts billed and collected prior to services being performed are included in deferred revenues.

178.    In violation of GAAP and its publicly disclosed revenue recognition policy, Vivendi, throughout the Relevant Period, improperly recognized anticipated revenue from multi-year public service contracts upon signing on the contracts.  In so doing, Vivendi materially overstated its reported operating results during the Relevant Period in violation of U.S. GAAP and its publicly disclosed policy of revenue recognition.

179.    For example, according to a former officer of U.S. Filter, during the Relevant Period, Vivendi Environmental, through its U.S. Filter subsidiary, materially overstated its operating results by employing a practice internally referred to as "booking backlog."  Pursuant to such practice, US Filter improperly recognized and reported the entire dollar amount of long-term, fixed priced contracts as revenue upon the signing of the contract, and, according to a former officer of U.S. Filter, its revenue on major contracts was overstated due to such practice "by as much as 10 times." Vivendi Environmental accounted for approximately 51% of Vivendi's reported revenues and operating income during the year ended December 31, 2001, and its U.S. Filter subsidiary reported EURO 1.32 billion in total revenue in 2000.

180.    U.S. GAAP, in APB No. 22, ¶7, provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company, and further states that information about the accounting policies

adopted by a reporting company is "essential" for financial statement users.  (APB No. 22, ¶ 8)
Accordingly, U.S. GAAP requires that financial statements identify and describe important
judgments as to the appropriateness of principles relating to the recognition of revenue.  (APB No.
22, ¶ 12)

181.    During the Relevant Period, Vivendi materially inflated its operating results and
violated its stated policy of revenue recognition and U.S. GAAP when it recognized and reported
revenue on such transactions because the "revenue" was not earned, services were not rendered and
the Company had not yet substantially performed the obligations which entitled it to the benefits
represented by the revenue.  In so doing, investors were uninformed about actual accounting
policies that were "essential" to an informed investment decision.

182.    Indeed, Vivendi's management directed or knowingly condoned and encouraged the
process in which employees would improperly record revenue, thereby inflating reported revenue.
Indeed, the term "booking to backlog" was a phrase that was widely used among US Filter
personnel, and the phrase was even included in monthly reports given to the Executive Board of
Vivendi Environmental.

183.    In addition to the accounting improprieties stated above, Vivendi presented its
financial statements during the Relevant Period in a manner which also violated at least the
following provisions of GAAP:

(i)    The concept that financial reporting should provide information that
is useful to present and potential investors and creditors and other users in making rational
investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(ii)    The concept that financial reporting should provide information
about the economic resources of an enterprise, the claims to those resources, and the effects of

transactions, events and circumstances that change resources and claims to those resources
(Concepts Statement No. 1, ¶40);

(iii)    The concept that financial reporting should provide information
about how management of an enterprise has discharged its stewardship responsibility to owners
(stockholders) for the use of enterprise resources entrusted to it.  To the extent that management
offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for
accountability to prospective investors and to the public in general (Concepts Statement No. 1,
¶ 50);

(iv)    The concept that financial reporting should provide information
about an enterprise's financial performance during a period.  Investors and creditors often use
information about the past to help in assessing the prospects of an enterprise. Thus, although
investment and credit decisions reflect investors' expectations about future enterprise performance,
those expectations are commonly based at least partly on evaluations of past enterprise performance
(Concepts Statement No. 1, ¶ 42);

(v)    The concept that financial reporting should be reliable in that it
represents what it purports to represent.  That information should be reliable as well as relevant is a
notion that is central to accounting (Concepts Statement No. 2, ¶¶58, 59);

(vi)    The concept of completeness, which means that nothing is left out of
the information that may be necessary to ensure that it validly represents underlying events and
conditions (Concepts Statement No. 2, ¶ 79);

(vii)    The concept that conservatism be used as a prudent reaction to
uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately
considered.  The best way to avoid injury to investors is to try to ensure that what is reported
represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

184.    The foregoing accounting improprieties caused Vivendi to issue financial statements that materially falsified its financial performance to the detriment of unsuspecting investors – including Plaintiffs – and further masked the problems the Company was experiencing during the Relevant Period.  In filing financial statements with the SEC which did not conform to the requirements of U.S. GAAP, the Defendants repeatedly disseminated financial statements of Vivendi which were presumptively misleading and inaccurate.  The accounting machinations detailed herein further evidence the Defendants' intent to deceive investors during the Relevant Period and misrepresent the truth about the Company and its business, operations and financial performance to detriment of those who relied on them.

185.    The Company's Relevant Period annual and interim financial statements filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.

### DEFENDANTS' FAILURE TO DISCLOSE MATERIAL ADVERSE FACTS CONCERNING VIVENDI'S SEVERE LIQUIDITY PROBLEMS

186.    For the reasons set forth in the immediately preceding paragraphs, Defendants materially overstated Vivendi's financial performance during the Relevant Period in violation of GAAP.

187.    However, during the Relevant Period, Defendants also repeatedly made material misstatements and omissions concerning the Company's liquidity.  Unbeknownst to Plaintiffs, investors or the financial markets, and contrary to Defendants' repeated assurances that the Company was in strong financial condition, Vivendi's implementation of its growth-by-acquisition

strategy caused it to overpay for businesses and saddled the Company with a huge debt burden that the operations of the acquired businesses could not satisfy.

188.    As a result, Vivendi was under great strain to meet its obligations in the ordinary course as they came due.  The causes of Vivendi's liquidity problems included the following:

(a)    **Inability to generate expected cash flows from acquired companies**. As set forth in detail above in the section discussing Vivendi's failure to timely recognize impairments to goodwill (*see* ¶¶ 124-152), cash flows from a number of Vivendi's largest acquisitions (including, *inter alia*, Canal Plus, Universal and U.S. Filter) fell dramatically short -- by billions of dollars -- of meeting the implied cash flow expectations that would have been necessary to justify Vivendi's publicly reported valuation of its "goodwill."  Indeed, as described generally above, Vivendi's financial performance fell sufficiently short of the expectations that Defendants had fostered during the Relevant Period that Defendants caused Vivendi to engage in a variety of other GAAP violations to conceal the Company's actual results.

(b)    **Vivendi's Undisclosed 2001 Stock Buybacks**.  Further exacerbating Vivendi's cash flow situation was defendant Messier's undisclosed and massive stock buy-back program, which -- unbeknownst to Plaintiffs and investors -- caused the Company to spend approximately $6.3 ***billion*** of the Company's cash on acquiring Vivendi shares.  As later reported in the *Wall Street Journal* on October 31, 2002:

> Mr. Messier, a former top investment banker with Lazard LLC, was famously fond of deal making.  But now it turns out he pursued many more deals than has been publicly known.  More important, he spent billions of dollars buying back Vivendi stock on the market last year without consulting his CFO or the board, according to people familiar with the situation.  Trying to prop up the stock price, he instead only sent Vivendi's debt soaring.
>
> *            *            *
>
> The board signed off on Mr. Messier's acquisitions.  But it did so without knowing the full extent of his spending spree, current and

former board members say.  That is because Mr. Messier didn't tell the board about his single biggest expenditure: the purchase of 104 million Vivendi shares, or nearly 10% of the company's equity, on the stock market during 2001.  His purpose was to prop up the share price.  The cost: $6.3 billion.

Shareholders had earlier approved a resolution allowing Vivendi to buy back up to 10% of its shares.  But current and former directors say they expected to hear beforehand about such massive purchases.

\*    \*    \*

Mr. Hannezo opposed the stock purchases as a waste of cash . . . .  This resulted in Mr. Messier trying to circumvent his CFO on the buybacks.  The ex-chairman placed his stock orders by phone with two mid-level employees in the finance department, Hubert Dupont Lhotelain and Francois Blondet, according to a person familiar with the matter . . . .

In early December 2001, the CFO finally intervened by forbidding his subordinates to take Mr. Messier's phone calls, the person familiar with the situation says Mr. Hannezo set up a formal process to slow Mr. Messier down, requiring that the chairman request buybacks in writing, along with some justification.

\*    \*    \*

By December, the buybacks had taken their toll: Vivendi was running out of cash, according to Mr. Hannezo's memo to the COB.  [Emphasis added.]

(c)    **Undisclosed Off Balance Sheet Liabilities**.  During the Relevant Period,

Defendants also misled investors about an off-balance sheet liability that further threatened

Vivendi's liquidity and ultimately cost Vivendi hundreds of millions of dollars and impaired

Vivendi's liquidity crisis.  In late 2000 and 2001, Defendants wagered on the future success of the

Company by selling put options to raise cash to fund executive compensation.  These put options

obligated Vivendi to purchase in the future at least 22.8 million of its own shares, or approximately

2% of all outstanding Vivendi stock, at an average price of € 69.  Even as Vivendi's share price

dropped during 2001 and the first half of 2002, making it increasingly likely that the Company would

take a large loss on the options, Defendants continued to conceal the true nature and extent of these

liabilities, and to misrepresent Vivendi's true liquidity condition. Moreover, even when Defendants finally made limited disclosures of its put obligations in the spring of 2002, the disclosures were woefully inadequate. For example:

(i)      After being criticized by the French press for concealing the risk connected to the options, Vivendi claimed that defendant Hannezo went over the put options with analysts at an accounting workshop March 6, 2002 in Paris. However, as the May 1, 2002 edition of *The Wall Street Journal* reported, **"analysts who were present or listened in said Vivendi glossed over the issue,"** [Emphasis added] and Vivendi admitted that discussion of the puts was "easy to miss" at the accounting workshop. Moreover, the slide presentation from this workshop, belatedly filed with the SEC as an exhibit to Vivendi's May 2, 2002 Form 6-K did not mention Vivendi's put obligations.

(ii)     On April 15, 2002, Vivendi disseminated its annual report on Form 6-K for FY 2001 which contained a translation of its 2001 year end financial statements. This translation also made only vague reference to Vivendi's put obligations:

> In connection with the sale of puts on its shares, Vivendi Universal had a commitment, at December 31, 2001, to buy 19.7 million shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million shares at an exercise price of €50.50 in January 2003.

Vivendi's annual report therefore did little to clarify the details of Vivendi's risks and obligations in connection with the put options. For example, other than specifying that Vivendi could be forced to purchase 3.1 million shares in January 2003, the report failed to inform investors of the scope, if any, of the Company's obligations with respect to the puts after December 31, 2001. The report also failed to comment on whether the options were likely to be exercised given the decline in Vivendi's stock price, or their potential adverse impact on Vivendi's liquidity.

(iii)    On April 18, 2002 (as later reported by the May 1, 2002 *Wall Street Journal*) Laura Martin, who heads Vivendi's investor-relations departments, sent an e-mail to selected analysts that purported to clarify Vivendi's obligations with respect to the put options:

> In a sign that Vivendi itself was conscious it hadn't made clear enough the consequences of the put options, Laura Martin, who heads the company's investor-relations department, sent an e-mail to four analysts on April 18 spelling the put options out clearly.

> In the e-mail, Ms. Martin said Vivendi had 18 million put options outstanding that the company sold to undisclosed parties for 12 euros each and that carry an exercise price of 69 euros. She estimated the impact on the company's balance sheet at 50 million euros to 1.2 billion euros. The e-mail went on to say that, though previously raised at the [March 6, 2002] accounting workshop, the put options "were easy to miss."

Still, Martin's "selective disclosure" failed to state the timetable for Vivendi's future obligations, preventing analysts and investors from making a reasonable assessment with regard to Vivendi's cash flow for the immediate future. In addition, Ms. Martin's range of potential liability was rendered meaningless by its impossibly large scope and failure to reference when the obligation would come due.

(iv)    It was therefore not until May 28, 2002, in its Form 20-F for the year ending 2001, that Vivendi began to inform investors about its true potential adverse effects ensuing from the put options:

> Except for one put sold in 1998, Vivendi Universal in 2001 sold puts to banks on 19.7 million ordinary shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary shares at an exercise price of €50.50 in January 2003. As of April 30, 2002, approximately 16 million of these puts remain outstanding....

> Vivendi Universal's contingent liability relating to these puts is approximately €1.1 billion to settle the 16 million puts outstanding for cash at an average of €69 per put and approximately €540 million to settle the 16 million puts outstanding for cash by paying the banks the difference between the average of €69 per put and the market price per ordinary share of Vivendi Universal as of April 30, 2002.

A later June 7, 2002 article in the *Economist* reported that Hannezo had confirmed that Vivendi was using cash each month to buy out the costly put options.

          (v)        In its 2002 half year financial statements released August 14, 2002,

Vivendi disclosed the impact its put obligations had during the first six months of 2002 alone:

> As at June 30, 2002 and December 31, 2001, Vivendi Universal had outstanding obligations on 13.9 million and 22.8 million shares respectively. The average exercise prices were €69 and €70 respectively, giving a potential commitment of €953 million and €1,597 million respectively. These put options are only exercisable on the specific date of the option and expire at various dates during 2002 and the first quarter of 2003.
>
>         *        *        *
>
> The cost to Vivendi Universal during the first half of 2002 by option holders exercising their rights amounted to €239 million.

**The Magnitude of the Undisclosed Liquidity Problem**

      189.     As subsequently reported by the *Wall Street Journal* in an article entitled "How Messier Kept Cash Crisis at Vivendi Hidden For Months: Media Giant Was At Risk Well Before Investors Knew" and dated October 31, 2002, Vivendi's acquisition spree, together with the other factors referenced in the preceding paragraphs, had put Vivendi on the brink of catastrophe:

> On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.
>
> "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief financial officer. "All I ask is that all of this not end in shame."
>
> That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.
>
> When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV

and film businesses, Mr. Messier made no mention of the close call
with the rating agencies. Instead, when a director asked about
Vivendi's financial profile, Mr. Messier said the company had no
problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's
pitch that it would help complete Vivendi's transformation from a
onetime water utility into an entertainment giant. He boasted that
the company would be able to distribute the movies and music made
by its Universal Studios and Universal Music units by means of
cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits. The USA Networks
deal, along with a $1.5 billion investment in satellite-TV operator
EchoStar Communications Corp., in fact signaled the beginning of
the end for Mr. Messier. The boy wonder of the French business
establishment was ousted seven months later in July, after directors
discovered the company was skirting close to a bankruptcy filing.

As new management struggles to salvage the French conglomerate, it
has become clear that Vivendi came close to financial disaster far
earlier than previously thought. <u>That picture is starkly at odds with
the one repeatedly presented by Mr. Messier to investors and his
board.</u> [emphasis added]

190.     Similarly, citing an article first appearing in *Le Monde*, Bloomberg reported on

May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

Vivendi Universal SA, the world's second-largest media company,
was close to insolvency at the end of 2001 after delays in planned
asset sales, French daily Le Monde said, without citing anyone.

Delays in the sale of the Seagram liquor unit and a French magazine
business caused a "serious cash crisis" at the Paris-based company,
which faced payments of about 10 billion euros ($9 billion) at the end
of last year, the paper said. Today, Vivendi's businesses "barely
produce the cash needed to pay the bills," according to the report.…

Vivendi's cash woes help explain why the company sold 55 million of
its own shares in January, 9 percent of Vivendi Environnement SA,
as well as its stake in AOL Europe and British Sky Broadcasting Plc,
Le Monde said. Since the beginning of the year, Vivendi shares have
lost half their value.

191.     Although Defendants' denied any pending liquidity crisis in response to the *Le Monde*

report and reassured investors during the spring and early summer of 2002 that Vivendi could meet

its obligations for the next 12 months, in reality the Company continued to teeter on the edge of

bankruptcy.

192.    Similarly, on September 27, 2002, the *AFX News* reported:

> Vivendi Universal chairman Jean-Rene Fourtou said the company
> would have been forced to declare bankruptcy within 10 days if Jean-
> Marie Messier had not resigned, according to a report in Le Figaro.

193.    On December 13, 2002, the *Associated Press* reported, based on an article first

appearing in *Le Monde*, that defendant Hannezo admitted that 2001 was marked by a series of errors,

including underestimating the debt problem:

> Electronic mail seized in an investigation of alleged financial
> irregularities at Vivendi Universal and other documents show
> escalating tension amid a growing debt crisis that led to the fall of
> flamboyant Chairman, Jean-Marie Messier.
>
> Board member Edgar Bronfman Jr. of Canada's Seagrams empire,
> which was purchased by Vivendi in 2000, warned Messier in an e-
> mail that he could be courting danger with his "very costly personal
> shows," according to Friday's edition of the newspaper Le Monde.
>
> And former Financial Director Guillaume Hannezo, in a note to
> France's stock exchange watchdog, said Messier had turned Vivendi
> into a "permanent deal machine," while an "urban guerrilla
> atmosphere" gripped a divided board, the newspaper said.
>
>        *     *     *
>
> Hannezo, the former finance director, said in his 20-page report to
> the COB that 2001 was marked by the "accumulation of a series of
> errors," including underestimating that the debt problem, according
> to Le Monde.
>
>        *     *     *
>
> Hannezo, a key figure in the COB investigation, speculated that
> Vivendi could have been spared its debt mountain in 2001 "had it
> resolved to sell before buying . . . .   Unfortunately, it oriented itself
> toward the inverse choice, satisfying itself with potential riches," he
> wrote.  Vivendi's shares have tumbled around 75 percent this year.

## ADDITIONAL SCIENTER ALLEGATIONS

194.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public, including Plaintiffs; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Vivendi, were active and culpable participants in the fraudulent scheme alleged herein.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.    Indeed, defendant Messier stated on December 6, 2000:

> "We are an Old World conglomerate that has grown by five times," says Messier with obvious pride.    "You don't do that without concentrating on margins day by day.    At the same time we have reshaped the group and managed it on a day-to-day basis, the French executive explained recently at a conference organised in London by bankers Goldman Sachs."

195.    On May 31, 2002, it was reported that Vivendi's board established a corporate-governance committee to monitor Messier's strategic and financial decisions.    According to *The National Post* on May 31, 2002, "[t]he move is an embarrassing comedown for Mr. Messier, who once boasted he did not have to answer to anyone."    The ongoing fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

196.    Each Defendant possessed substantial motives for misrepresenting Vivendi's financial status, operations, and prospects throughout the Relevant Period.  The Company's ability to maintain positive credit ratings, and, therefore, its ability to obtain additional financing in the future were dependent on Defendants' fraudulent scheme.  Defendants were further motivated to conceal the adverse facts detailed herein in order to acquire other companies using Vivendi's artificially inflated shares.  For example, during the Relevant Period, in addition to consummating the Seagram and Canal Plus acquisitions in late 2000 for a combined total of $46 billion in Vivendi common stock and ADSs, during the Relevant Period Vivendi also financed (or partially financed), its acquisitions of, at least, USA Networks (at least $1.65 billion of the purchase price with Vivendi stock), MP3.com and Multithematiques using Vivendi's artificially inflated stock as currency.[5]

197.    Defendants were further motivated to boost Vivendi's share price because Messier made a huge bet that Vivendi shares would rise by selling put options to banks in late 2000 and 2001.  The options committed Vivendi to buy back tens of millions of its shares at fixed prices in the future.  On October 31, 2002, *The Wall Street Journal* discussed Messier's stock buy-backs and sales of put options:

> Mr. Messier had a special incentive to boost Vivendi's share price with the buy-backs: He had made a massive bet on the company's behalf that Vivendi shares would rise by selling "put options" to banks in late 2000.  The options committed Vivendi to buy back tens of millions of its shares at fixed prices in the future.  If Vivendi's share price were to fall, the company could lose as much as $1.4 billion on the options.  Even with the buy-backs, the share price fell in the end.  So far, the put options have cost Vivendi $900 million.

198.    Defendant Messier was also given a bonus for boosting Vivendi's EBITDA by more than 30 percent in 2001.  On June 6, 2002, it was reported in the *New York Post*:

---

[5]  Although Vivendi engaged in literally dozens of other acquisitions during the Relevant Period, the terms of those transactions were typically not disclosed in detail.  Accordingly, the number of Vivendi acquisitions financed in whole or in part with inflated Vivendi common stock may well be greater than the foregoing list suggests.

> Vivendi Universal Chairman and Chief Executive Officer Jean-Marie
> Messier, despite the sorry state of his company's stock, was given a
> bonus of more than $3 million for meeting an earnings goal, a filing
> with the Securities and Exchange Commission said.
>
> Messier was given the bonus, two-and-a-half times his salary, for
> boosting earnings before interest, taxes, depreciation and
> amortization by more than 30 percent in 2001.  Had earnings risen
> more than 35 percent, Messier would have received three times his
> base salary as a bonus.
>
> Messier earned $4.8 million in bonus and salary for 2001.  The
> chairman also got 835,000 stock options.

199.    Upon information and belief, Hannezo's bonus payments were also dependant upon

Vivideni's EBITDA.[6]  For this reason, the SEC Settlement, described above, required Hannezo to

disgorge more than $140,000 in bonus payments.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

200.    Pursuant to their claims under Section 10(b) of the Exchange Act and Rule 10b-5

thereunder, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-

the-market doctrine such that:

(a)     Defendants made public misrepresentations or failed to disclose material

facts during the Relevant Period;

(b)     the omissions and misrepresentations were material;

(c)     the securities of the Company traded in a open and efficient markets;

(d)     the misrepresentations and omissions alleged would tend to induce a

reasonable investor to misjudge the value of the Company's securities; and

---

[6] "The company even bases its bonus scheme for top management on ebitda."  Economist, June 8, 2002.

(e)     Plaintiffs purchased or otherwise acquired their Vivendi securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

201.    At all relevant times, the market for Vivendi's securities was an efficient market for the following reasons, among others:

(a)     Vivendi's ordinary shares actively traded on the Paris Bourse and Vivendi's American Depositary Shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, Vivendi filed periodic public reports with the SEC and the COB (now AMF);

(c)     Vivendi regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Vivendi was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

202.    As a result of the foregoing, the market for Vivendi's securities promptly digested current information regarding Vivendi from all publicly available sources and reflected such information in Vivendi's stock price.  Under these circumstances, all purchasers of Vivendi's ordinary shares and ADSs during the Relevant Period, including Plaintiffs, suffered injury through their purchase of Vivendi's securities at artificially inflated prices, and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

203.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  Moreover, the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent that any of the statements identified herein as materially false and misleading are held by the Court to be forward-looking statements, there were no meaningful cautionary statements identifying important then-present factors that could, and indeed did, cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of Vivendi who knew that those statements were false when made.

## LOSS CAUSATION

204.    During the Relevant Period, the price of Vivendi ordinary shares and ADSs were artificially inflated as a result of Defendants' false and misleading statements and omissions of material facts.  When the truth was revealed, in whole or in part, the price of Vivendi ordinary shares and ADSs fell and caused Plaintiffs to sustain damages and economic losses.  Accordingly, Plaintiffs' damages and economic losses were proximately caused by the corrective disclosures and subsequent drop in the price of Vivendi ordinary shares and ADSs set forth in detail above.

## COUNT I

### Violations Of Section 11 Of
### The Securities Act Against All Defendants

205.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence.

206.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants.  This Count does not sound in fraud.

207.    The Registration Statement in connection with the Merger, was inaccurate and misleading, contained untrue statements of material facts (including but not limited to, false financial results), omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

208.    Vivendi is the registrant for the shares issued in connection with the Merger.  The Individual Defendants were responsible for the contents and dissemination of the Registration Statement issued in connection with the Merger and caused it to be filed with the SEC.  Each of the Individual Defendants signed the Registration Statement.

209.    Plaintiffs acquired Vivendi ordinary shares and ADSs issued in exchange for their Vivendi SA shares and their Seagram shares pursuant to the Merger.

210.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.  Each of the Defendants acted negligently in issuing the Registration Statement and Prospectus.

211.     Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

212.     At the times they acquired Vivendi ordinary shares and ADSs Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

213.     As a result of the foregoing, Plaintiffs have sustained damages.  The value of Vivendi ordinary shares and ADSs have declined substantially subsequent to and due to Defendants' violations.

## COUNT  II

### Violations Of Section 12(a)(2) Of
### The Securities Act Against All Defendants

214.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

215.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against all Defendants.  This Count does not sound in fraud.

216.     Defendants were sellers and offerors of the shares offered pursuant to the Prospectus.

217.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose

material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.

218.    Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the Prospectus as set forth above.

219.    Plaintiffs acquired Vivendi ordinary shares and ADSs pursuant to the defective Prospectus. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

220.    By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs are entitled to damages pursuant to Section 12(a)(2).

**COUNT III**

**Violation Of Section 15 Of The Securities Act**
**<u>Against The Individual Defendants</u>**

221.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence.

222.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants. This Count does not sound in fraud.

223.    Each Individual Defendant was a control person of Vivendi by virtue of their position as directors and/or senior officers of the Company. The Individual Defendants each had a

series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Vivendi.

224.    Vivendi, as issuer of the Registration Statement, is liable under Section 11.  Each Individual Defendant was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the materially false and misleading Registration Statement and having otherwise participated in the Merger.

## COUNT  IV

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

225.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

226.    During the Relevant Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) enable Vivendi to complete several acquisitions, as described herein, using its artificially inflated securities as currency; and (iii) cause Plaintiffs to purchase Vivendi's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendant Vivendi and the Individual Defendants, and each of them, took the actions set forth herein.

227.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vivendi's ADSs and ordinary shares in violation of Section 10(b) of the Exchange

Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

228.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Vivendi as specified herein.

229.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vivendi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Vivendi and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Vivendi ordinary shares and ADSs during the Relevant Period.

230.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Relevant Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances,

operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

231.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vivendi's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, financial condition, operations and growth throughout the Relevant Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

232.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's ordinary shares and ADSs were artificially inflated during the Relevant Period.  In ignorance of the fact that market prices of Vivendi's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by Defendants during the Relevant Period, Plaintiffs acquired Vivendi ordinary shares and ADSs during the Relevant Period at artificially high prices and were damaged thereby.

233.    At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the marketplace known the truth regarding the problems that Vivendi was experiencing, which were not disclosed by Defendants, Plaintiffs would not have purchased or otherwise acquired their Vivendi ordinary shares and ADSs, or, if they had purchased such securities during the Relevant Period, they would not have done so at the artificially inflated prices which they paid.

234.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

235.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs suffered damages.

## COUNT  V

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

236.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.

237.    The Individual Defendants acted as controlling persons of Vivendi within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

238.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

239.    As set forth above, Vivendi and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's securities during the Relevant Period.

## COUNT VI

### For Liability under Section 18 of the Exchange Act
### <u>Against All Defendants</u>

240.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence. This Count is asserted against Defendants for their violations of Section 18 of the Exchange Act, 15 U.S.C. § 78r.

241.    As set forth above, Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, untrue with respect to

material facts, in annual reports on Form 20-F, documents filed with the SEC pursuant to the SEC's applicable rules and regulations.

242.    In reliance on these materially untrue statements, Plaintiffs made investment decisions to purchase and otherwise acquire ordinary shares and ADSs of Vivendi.

243.    Plaintiffs reasonably relied on each of these statements when deciding to purchase and otherwise acquire the ordinary shares and ADSs of Vivendi, not knowing that the statements were untrue.

244.    The Individual Defendants signed the Company's SEC filings throughout the period of untrue statements discussed herein.

245.    When the truth was revealed about the false and misleading statements in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting decline in the value of ordinary shares and ADSs of Vivendi.

246.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with their acquisitions and purchases of ordinary shares and ADSs of the Company.

## COUNT VII

### For Common Law Fraud and Deceit
### <u>Against All Defendants</u>

247.    Except for the counts sounding in fraud, Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is asserted against all Defendants for common law fraud and deceit.

248.    Plaintiffs, without knowledge of the falsity of Defendants' statements and omissions of material fact, described above, and believing such statements to be true and complete, and in reasonable and justifiable reliance upon the statements and representations made by the Defendants, as previously set forth herein, purchased or otherwise acquired ordinary shares and ADSs of Vivendi

in reliance upon the truth and completeness of the statements contained in the representations made by Defendants.

249.    Specifically, Plaintiffs relied on Defendants' statements and omissions of material fact as set forth in detail above.  Such reliance was based on review of annual reports, quarterly earnings, press releases issued to announce earnings and other matters, and reports issued by equity analysts at major Wall Street firms.  Within such documents, Plaintiffs specifically reviewed and relied on the reported revenue, earnings, financial condition, and operating potential of Vivendi.

250.    Plaintiffs would not have purchased or otherwise acquired ordinary shares and ADSs of the Company during the Relevant Period, except for their reliance upon the representations made by Defendants.

251.    Certain of the false and misleading statements made by Defendants were set forth in SEC filings, press releases and other public statements that were heard or read directly by Plaintiffs.  Other false and misleading statements made by these Defendants were heard or read by third parties who subsequently communicated such false and misleading statements to Plaintiffs.  All of these Defendants' statements were intended by these Defendants to be communicated to members of the investing public, including Plaintiffs, and Defendants intended such persons, including Plaintiffs, to rely thereon.

252.    At the time the false statements and representations alleged to be actionable were made by the Defendants, the Defendants knew them to be false and/or recklessly made said statements and representations without any knowledge of the truth thereof.

253.    At the time of the false statements, misrepresentations and omissions, set forth above, each of the Defendants intended that Plaintiffs act on the basis of their misrepresentations and omissions in deciding whether to purchase or otherwise acquire ordinary shares and ADSs of Vivendi.  Plaintiffs reasonably relied thereon to their detriment in making such decisions.

254.    Had Plaintiffs known of the material facts which Defendants wrongfully concealed and misrepresented, and the falsity of the Defendants' representations, Plaintiffs would not have purchased or otherwise acquired ordinary shares and ADSs of Vivendi during the Relevant Period.

255.    Plaintiffs, as a direct result of their purchases and by reason of these Defendants' wrongful concealment and misrepresentations, have sustained pecuniary loss for which these Defendants are hereby liable, both jointly and severally, in an amount to be established at trial.

256.    In addition, Defendants' fraudulent acts represent an extensive pattern of wrongdoing constituting a wanton and reckless disregard for Plaintiffs' rights and were directed at the public generally.  Therefore, Plaintiffs are entitled to punitive damages in an amount to be established at trial.

## COUNT  VIII

### For Negligent Misrepresentation
### <u>Against All Defendants</u>

257.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence.  This Count is asserted against all Defendants for negligent misrepresentation.

258.    In an effort to induce Plaintiffs to purchase ordinary shares and ADSs of Vivendi, Defendants each negligently and without reasonable care made misrepresentations of material facts to investors, including Plaintiffs, and each acted negligently and without reasonable care in failing to disclose or concealing the true facts from Plaintiffs, as detailed herein.

259.    In addition, Defendants each negligently and without reasonable care made and participated in the making of public misrepresentations of material facts concerning Vivendi's

operations and published financial results, and each negligently and without reasonable care failed to disclose or negligently concealed the true facts relating thereto.

260.    Defendants each breached their duty to provide accurate information to Plaintiffs by failing to exercise reasonable care in communicating information regarding Vivendi, as detailed herein.

261.    Defendants intended for Plaintiffs to rely on the misrepresentations alleged herein.

262.    Plaintiffs justifiably relied to their detriment upon the false information that the Defendants each provided in deciding to purchase ordinary shares and ADSs of Vivendi and in determining the price to be paid for such ordinary shares and ADSs of Vivendi.

263.    As a direct and proximate result of the Defendants' negligent conduct, Plaintiffs have sustained pecuniary losses, including costs and attorneys' fees, for which these Defendants are hereby liable, both jointly and severally, in an amount to be established at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)    Declaring and determining that Defendants violated federal securities and state laws by reason of their conduct as alleged herein;

(b)    Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing; in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs punitive damages against all Defendants on the claims for common law fraud an deceit;

(d)    Awarding Plaintiffs rescission;

(e)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including fees for Plaintiffs' counsel and experts; and

(f)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

| Dated:  New York, New York<br>June 15, 2007 | LABATON SUCHAROW & RUDOFF LLP<br><br>By:<br>Lawrence A. Sucharow (LS-1726)<br>Eric J. Belfi (EB-8895)<br>Russel N. Jacobson (RJ-2268)<br>Michele C. Cerullo (MC-8481)<br>100 Park Avenue<br>New York, New York  10017<br>(212) 907-0700<br><br>*Attorneys for Plaintiffs* |
|---|---|